John E. TRILLING, Appellant,

v.

UNITED STATES of America,
Appellee.

Nos. 13069, 13165, 13212.

United States Court of Appeals
District of Columbia Circuit.

Argued Dec. 11, 1957.

Decided April 17, 1958.

Dissenting Opinion as amended
Dec. 11, 1958.

See, also, D.C., 156 F.Supp. 462.

Mr. John Idomir, Washington, D. C.,
for appellant.

Mr. E. Tillman Stirling, Asst. U. S.
Atty., with whom Messrs. Oliver Gasch,
U. S. Atty., and Lewis Carroll, Asst. U. S.
Atty., and Forbes W. Blair, Asst. U. S.
Atty., at the time the brief was filed,
were on the brief, for appellee. Messrs.
Harold D. Rhynedance, Jr., and Joel D.
Blackwell, Asst. U. S. Attys., entered ap-
pearances for appellee. Mr. Richard J.

Snider, Asst. U. S. Atty., also entered an appearance in No. 13165 for appellee. Mr. Milton Eisenberg, Asst. U. S. Atty., also entered an appearance in No. 13212 for appellee.

Before EDGERTON, Chief Judge, and PRETTYMAN, WILBUR K. MILLER, BAZELON, FAHY, WASHINGTON, DANAHER, BASTIAN and BURGER, Circuit Judges, sitting in banc.

PER CURIAM.

These appeals were heard together. In regard to Count 3 in No. 13069, a majority of the court are of opinion there was no error. In regard to the other counts of No. 13069, and in each of the other cases, a majority of the court are of opinion there was prejudicial error in admitting in evidence certain statements the police obtained from appellant. The conviction on Count 3 is affirmed. The other convictions are reversed.*

DANAHER, Circuit Judge.

We consolidated the appeals in these cases because the common question involved the receipt in evidence of Trilling's confessions or admissions made to police before Trilling was arraigned. Were the circumstances such that all must be excluded? A codefendant, Watts, had pleaded guilty to all counts, but Trilling had moved to exclude all confessions and admissions on the ground there had been unnecessary delay in arraignment. In the separately tried cases, hearings out of the presence of

the jury were conducted by three different District Judges, each of whom concluded that the confessions should be received, subject to determination by the jury as to their voluntary character. While the appeals were pending, the Supreme Court decided Mallory v. United States.[1] As there applied, Fed.R.Crim. P. 5(a), 18 U.S.C.A. seems to permit differing results in varying situations. It is not simply a matter of hours, one way or another, but of police purpose and conduct in the light of circumstances.

■ Thus, confessions of guilt as to the first two counts of case No. 13069 and as to each of the two counts in Nos. 13165 and 13212 are in a different category from an admission of guilt as to the third count of No. 13069, wherein Trilling and Watts had been charged with breaking and entering a warehouse owned by Johnson & Wimsatt, Inc. Upon ample "probable cause," Trilling had been arrested solely on *this charge*. A police officer, a long-time friend of the family, who had had nothing to do with Trilling's arrest, after learning that Trilling had been locked up pending arraignment, confronted Trilling with the evidence against him, and he readily admitted his guilt. We believe that, under the circumstances to be set forth, the Mallory decision does not call for the exclusion of Trilling's admission. Out of sequence, turning first to this Johnson warehouse count, a majority of the court are in agreement that the conviction should be affirmed. We take up the Johnson warehouse count in Part I.

---

* Circuit Judges Danaher and Burger vote to affirm the conviction on Count 3 in No. 13069 and to reverse the other convictions. Judge Danaher files an opinion (104 U.S.App.D.C. at page ——, 260 F.2d at page 678) in which Judge Burger joins. Judge Burger files a separate concurring opinion (104 U.S.App.D.C. at page ——, 260 F.2d at page 685). Circuit Judges Prettyman, Wilbur K. Miller and Bastian concur in Part I of Judge Danaher's opinion.

Chief Judge Edgerton and Circuit Judges Bazelon, Fahy and Washington vote to reverse all the convictions. Judge

Bazelon files an opinion (104 U.S.App. D.C. at page ——, 260 F.2d at page 685) in which Judge Edgerton joins. Judges Fahy and Washington file a statement (104 U.S.App.D.C. at page ——, 260 F.2d at page 696).

Circuit Judges Prettyman, Wilbur K. Miller and Bastian vote to affirm all the convictions. Judge Prettyman files an opinion (104 U.S.App.D.C. at page ——, 260 F.2d at page 697) in which Judges Miller and Bastian join.

1. 1957, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479.

## I

Working the midnight shift, from 12:00 until 8:00 A.M., September 1, 1955, Detective Trammelle and Detective Davis were patrolling in the warehouse district where there had been a series of burglaries. About 2:15 A.M., they drove up to a warehouse owned by Johnson & Wimsatt, Inc., located on Twenty-fourth Place, N. E., a dead end street. There were four or five other warehouses on that street. There, within a few feet of the Johnson warehouse, they came upon a Dodge car, headed toward the street's dead end. As the police approached, Trilling got out from behind the wheel. The police asked if it was his car and he said no, he was driving it for Watts. He produced a driver's permit and also the registration card for the car. While Trammelle talked with Trilling, the officer noted in his book the names, permit numbers, and addresses of Trilling and Watts. Davis in the unlighted warehouse district went about with a flashlight examining the buildings but discovered no damage. Trilling and Watts were not then further detained.

The Company's yard manager, one Williams, arrived at the Johnson warehouse about 6:45 on the morning of September 1. He discovered that a window in one of the rear rooms had been broken, that the office had been ransacked, that invoices and papers had been scattered about, and that someone had attempted to open an inventory file resembling a safe. He notified police immediately.

Pursuant thereto, during the course of the day, September 1, a technician, Officer Miller, from the Identification Bureau, visited the Johnson warehouse to examine the premises for possible latent fingerprints. He discovered that a pane of glass had been broken out of a window, and he dusted with a fine camel's

hair brush on the glass to pick up whatever moisture or oil or perspiration might have been left on the glass by the prowler's fingers. He explained that the powder adheres to and forms an impression where a fingerprint has been left. He found prints on the inside of the pane of glass, and thereupon brought the latent prints to the identification office where they were photographed and "blown up." He secured prints of a man's right forefinger and the right middle finger.

The next midnight roll call having been completed about 12:01 A.M., on September 2, Trammelle and Davis having reported for duty at the Twelfth Precinct, a notation was read off from the teletype from Central Headquarters that the Johnson warehouse had been entered the previous night. They went back to the Identification Bureau of the Metropolitan Police to determine whether or not fingerprints had been found at the scene by the examining officers, and then learned of Miller's discovery. Trammelle asked that the officers in the Identification Bureau check the fingerprints, and Trammelle was informed that the fingerprints had been identified as those of Trilling found on the premises.[2] Trammelle and Davis then went looking for Trilling whom they placed under arrest at his home about 5:30 in the morning of September 2.

Officers Trammelle and Davis questioned Trilling about the break at the Johnson warehouse, both in the car on the way to the lockup and after their arrival. Trilling denied all knowledge of the episode.[3] Trilling was booked at No. 12 Precinct at 7:14 A.M., September 2, 1955, and later was transferred to the Central Cell Block at 7:40 A.M. *Neither Trammelle nor Davis had any further conversation with Trilling after he had been booked.*

2. Trilling's prints were already on file as a result of his conviction in June 1948, at Des Moines, Iowa, for violation of the Dyer Act, 18 U.S.C.A. §§ 2311–2313.

3. Of course, a prisoner's denials are not

barred, under the Mallory rule or any other; only "damaging statements" are interdicted in any event. Cf. Cohen v. United States, 9 Cir., 1944, 144 F.2d 984, 989, certiorari denied 1945, 323 U.S. 797, 65 S.Ct. 440, 89 L.Ed. 636.

Without more, there not only was ample "probable cause" for the arrest of Trilling, but there was overwhelmingly enough evidence to sustain his conviction. If there never had been another count in this case, and if there had been no other evidence, it would seem impossible that any jury could have failed to convict Trilling of breaking into the Johnson warehouse with intent to steal.

But there was more. The blown up photographs of the fingerprints found by Technician Miller at the scene were compared with blown up photographs of current fingerprints of Trilling taken after his arrest, on September 2nd. Miller's qualifications as a technician were conceded. A bench conference established that immediate identification of the Trilling prints, found at the warehouse, could be made since the officers could readily compare the latent prints found on the glass with those of record following Trilling's earlier conviction. The latter could speedily be located since Trammelle had Trilling's name. The trial judge pointed out that reference to the 1948 prints should not be made lest counsel in that manner get before the jury the existence of Trilling's prior record. Defense counsel sought, and was granted, permission to examine the witness before the exhibits should be offered in evidence.

Miller testified that throughout the history of the use of fingerprints for purposes of identification, it had never been shown that any two persons' fingerprints have been the same. Questioned by the judge as to whether or not there was a minimum basis upon which points of identification might depend, he testified that some eight or nine such points constitute a minimum. In the exhibits before the court he ruled off some twenty points of identification and showed that there were more than twice the minimum number of points established and others that could have been ruled off. Defense counsel elicited from the witness an explanation of the four different basic types of fingerprints, loops, whorls, arches and tinted arches. After the prints had been received in evidence as Government's exhibits (one set, those found at the warehouse, the other set, those made at headquarters following the arrest), cross examination went forward, each member of the jury having been handed photographs of the exhibits. The witness described the process of identification. The fingertips of the hand and the soles of a person's foot are covered with small holes which secrete oils and perspiration which form in lines very much like a chain. Tiny as a pinpoint, each of these holes makes its imprint. The witness explained the piece of glass from the Johnson warehouse window had been grasped by one whose thumb was on the outside and whose fingers were on the inside, thus making an impression which loomed up after being dusted with a fine black powder which adhered to the oil or perspiration which had come from the minute holes in the fingers. Defense counsel next brought out that a second point of identification involves the relationship of certain lines of holes to a number of other lines in the fingerprint. So, in relation to No. 3, in relation to No. 4, and to yet other points in the print, a basis for comparison was established. Without here setting forth further detail, it may be understood that the witness explained item by item. He was questioned as to ridges, arches, bends and lines, until finally we find the witness at a drawing board. There for the jury he drew out the details, culminating in a conclusive demonstration of the basis for the technician's opinion as an expert that the two sets of fingerprints were the same. The proof was irrefutable and complete. Trilling did not take the stand.

Detectives Trammelle and Davis had gone off duty about 8:00 A.M. Before Trammelle left headquarters he conferred with Detective-Sergeant Friel of the Safe Squad and briefed him upon the events of the previous thirty hours.

Sergeant Friel for many years had known Trilling's parents. He sent for

Trilling about *a quarter after 8.* His testimony shows:

"I talked to Trilling after I had received certain information from Detective Trammelle and confronted him with certain things, and after confronting Trilling with those things, why Trilling admitted breaking into that place with the co-defendant.

"Q. At what time was this, approximately? A. *About 8:20 or 8:30.*"

At 8:40 Sergeant Friel's presence in court was required and he left Trilling in the Identification Bureau with Sergeant Clark. Sergeant Friel did not reduce to writing the admission by Trilling. The admission was not necessary to establish a case against Trilling on this count. The disclosure was not necessary to support the arrest or ultimately the conviction. It was not the product of coercion in any respect whatever. It was voluntarily given within a few minutes of Trilling's being confronted by Friel with the evidence already amassed against him. Of course we know that Trilling was not then arraigned, but as to the foregoing aspect of *this* case, the failure to arraign is immaterial, even if detention thereafter became illegal.

Sergeant Friel's testimony, although not necessary to the result here and in that sense immaterial, was not erroneously received, indeed it seems to come squarely within the Court's ruling in United States v. Mitchell.[4]

"* * * [T]he foundations for application of the McNabb doctrine are here totally lacking. Unlike the situation in other countries * * * under the prevailing American criminal procedure, as was pointed out in the McNabb case, 'The mere fact that a confession was made while in the custody of the police does not render it inadmissible.' [McNabb v. U. S.] 318 U.S. 332, at page 346, 63 S.Ct. [608], at page 615, 87 L.Ed. 819. Under the circumstances of this case, the trial courts were quite right in admitting, for the juries' judgment, the testimony relating to Mitchell's oral confessions * * *."[5]

As the opinion proceeds, Mr. Justice Frankfurter points out:

"Obviously the circumstances of disclosure by Mitchell are wholly different from those which brought about the disclosures by the McNabbs. Here there was no disclosure induced by illegal detention, no evidence was obtained in violation of any legal rights, but instead * * * the prompt acknowledgement by an accused of his guilt, and the subsequent rueing apparently of such spontaneous cooperation and concession of guilt."[6]

■ It is true that Trilling then could have been arraigned. As to the Johnson warehouse count, this man had not been taken to police headquarters for the purpose of interrogation looking to the extraction of "damaging statements" to support his arrest. Quite the contrary, probable cause was complete. I do not understand that any of my colleagues challenge the conclusion of sufficiency of probable cause. Moreover, the "damaging statements" were not even necessary to support an ultimate finding of guilt within the meaning of the Mallory case. Just as in the Mitchell situation, Trilling was not arraigned, but his admission should not be barred even if it may be said his later detention became illegal, as the Mitchell case points out.

"But in any event, the illegality of [Trilling's] detention does not *retroactively change the circumstances under which he made the disclosures.* These, we have seen, were not elicited through illegality. Their ad-

---

4. 1944, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140.

5. Id., 322 U.S. page 69, 64 S.Ct. at page 897.

6. Id., 322 U.S. at page 70, 64 S.Ct. at page 898. And see, in further explanation of the Mitchell rule, United States v. Carignan, infra, notes 20–22.

mission, therefore, would not be use by the Government of the fruits of wrongdoing by its officers. Being relevant, they could be excluded only as a punitive measure against unrelated wrongdoing by the police. Our duty in shaping rules of evidence relates to the propriety of admitting evidence. This power is not to be used as an indirect mode of disciplining misconduct." [7] (Emphasis added.)

The command of the Rules and their purpose are fully explained in Mallory which we followed in our second Watson case,[8] where Watson's detention was *for the purpose* of extracting damaging statements and a reenactment of the crime to support his arrest and, finally, his guilt. Just as the *circumstances* in Mallory precluded a holding that arraignment had not been accomplished "without unnecessary delay," the converse is true here. The questioning of Trilling by the arresting officers was fruitless and met only with denials. They booked him at No. 12 Precinct at 7:14 and had no more talk with him. He was not taken to headquarters to be subjected to a *process* of inquiry. He was not taken there for the purpose of extracting a confession. The arresting officers had sought admissions, yes, but in the face of his denials they locked him up to await arraignment. No one else talked with him until Friel spoke with him about 8:15 or 8:20. By then Trilling had been transferred to the Central Cell Block awaiting arraignment, which could readily have occurred as the courts were about to open.

What next happened was that the Safe Squad intervened, as well as the officers of Homicide who were interested in the Aristo murder case. Instead of being arraigned at court, where full compliance with the requirements of the Rule could have followed, Trilling was taken for questioning in cases wholly unrelated to that for which he had been validly arrested. Thereafter followed the circumstances developed in Part II of this opinion. But Trilling's intervening admission to Friel in no way came within the interdiction of the Rule and the Mallory application of it. On the contrary, the admission to Friel within a few minutes of an interview and in no respect shown to have been the product of wrongdoing by police should be governed by the Mitchell case, supra. Thus weighed, the admission to Friel was properly received.[9]

In any event, the evidence was overwhelming as to Trilling's guilt on the Johnson warehouse count. It would seem the jury could properly have come to no other conclusion on this count. Thus, even if the statement to Friel could be said to have been erroneously admitted, this judgment as to the third count in No. 13069 should stand [10]

Affirmed.

7. Id. 322 U.S. at page 70–71, 64 S.Ct. at page 898.

8. Watson v. United States, 1957, 101 U.S. App.D.C. 350, 249 F.2d 106.

9. We pass over the distinction between oral admissions and written confessions, Morton v. United States, 1945, 79 U.S. App.D.C. 329, 332, 147 F.2d 28, 31, certiorari denied 1945, 324 U.S. 875, 65 S. Ct. 1015, 89 L.Ed. 1428. (Cf. Perovich v. United States, 1907, 205 U.S. 86, 91, 27 S.Ct. 456, 458, 51 L.Ed. 722, where the Court pointed out that as the conversations, not having been induced improperly, were purely voluntary, "there is no reason why they should not have been received." Of course, that case long antedated the adoption of the new Rules, but the statutes as to arraignment, just as construed in the McNabb case, were in full force. ·The Rules purport to reflect the intendment and the requirements of the earlier statutes.)

10. Of course if the admission had been the product of conduct violating constitutional rights, Bram v. United States, 1897, 168 U.S. 532, 18 S.Ct. 183, 42 L. Ed. 568, this result could not be sustained. Here Trilling had not even sustained his burden of showing a violation of the Court's rule of evidence. Thus we should affirm. Kotteakos v. United States, 1946, 328 U.S. 750, 764, 765, 66 S.Ct. 1239, 90 L.Ed. 1557.

## II

Here I state my separate views as to the impact of the Mallory rule as applied to the written confessions received as to the first two counts of No. 13069 and the remaining counts in cases Nos. 13165 and 13212. I agree that the confessions should have been excluded, and as a consequence the convictions must be reversed. The illegality under Rule 5(a) which bars the evidence stems from the *conduct* and the *purpose* of the police, as the Supreme Court has pointed out in the cases I shall cite.

I do not understand that the Supreme Court has said the *mere* passage of time is the touchstone as to incompetence of a prisoner's admissions while in custody. Questions are not *forbidden* but an arrest and conviction are not to *depend* upon the answers during a period of what may become illegal detention. Thus the Rule requires arraignment "without unnecessary delay," but reasonableness, dependent upon circumstances, is still a factor. I do not suppose a man intoxicated when arrested, or one confined in a hospital and there placed under arrest, must be arraigned any more promptly than circumstances permit. I would assume, to illustrate, that one charged as a rapist and known only to his victim might be placed in a "lineup" for purposes of identification. Having been so identified, his admissions thereupon are not automatically to be barred. I would assume it is still the rule that the burden is upon the accused to show that his admissions have been induced by illegality. I take it, then, that the "brief delay" mentioned in the Mallory case must be related to varying *circumstances*. Accordingly the mere passage of time which reasonably may elapse in differing situations following a *valid* arrest, will not cause to be excluded contemporaneous admissions. But, police elicitation from the accused during a period of *unlawful* detention of damaging statements to *support* the arrest and finally guilt, is a wholly different matter.

So applying the test, as I see it, the circumstances do not bar the oral admission as treated in Part I, supra. Measured by the same yardstick, the confessions on all other counts must be excluded as the cases I shall cite seem so clearly to require.

First, I dissociate myself from Judge Bazelon's opinion, and particularly do I dissent from his conclusion that confessions obtained by questioning an accused before arraignment are not admissible in evidence. I do not understand the Mallory case so to hold. Surely if the Supreme Court had intended to adopt any such automatic rule of exclusion, it would have been a simple matter to say so. On the contrary, the Court actually said that "the duty enjoined upon arresting officers to arraign 'without unnecessary delay' indicates that the command does *not* call for mechanical or automatic obedience." [11]

Rather, as I see it, the Court was saying that the Mallory detention of a suspect was unlawful under the circumstances so carefully spelled out, that the unlawful detention produced the disclosure, and therefore the confession, being "the fruits of wrongdoing" by the police officers, was rendered inadmissible. In so deciding, but with emphatic stress upon a different circumstantial aspect,[12] the Court was simply applying the rule as traced out in Tillotson v. United States.[13] There the problem before us specifically involved the admissibility of

---

11. Supra note 1, 354 U.S. at page 455, 77 S.Ct. at page 1359. If the Court had intended to overrule United States v. Mitchell, 1944, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140, it would have so stated.

12. "The circumstances of this case preclude a holding that arraignment was 'without unnecessary delay.'" Id., 354 U.S. at page 455, 77 S.Ct. at page 1360.

13. 1956, 97 U.S.App.D.C. 402, 231 F.2d 736, certiorari denied 1956, 351 U.S. 989, 76 S.Ct. 1055, 100 L.Ed. 1502. In Tillotson, we expressly were asked to exclude the confession *simply because it was taken by police before the accused was arraigned.*

a confession by a suspect before arraignment. We concluded the trial judge had not erred in receiving the confession although it was a razor-thin question whether or not the appellant had sustained her burden of showing that there had been an unnecessary delay in arraignment. The Supreme Court had denied *certiorari* in the Tillotson case only the year before the Mallory case. On the other hand, we found no basis for distinction between the Mallory circumstances and those developed in the second Watson case.[14] There we followed the Court's Mallory teaching that an accused is not to be taken to police headquarters *for the purpose of* extracting damaging statements upon which to base a charge of crime and ultimately to establish his guilt. He was *not* to be taken to headquarters to be subjected to a *"process of inquiry"* to determine whether or not he should be charged.[15]

Mallory held simply that a suspect "is not to be taken to police headquarters *in order to carry out a process of inquiry that lends itself,* even if not so designed,

to eliciting *damaging statements to support the arrest and ultimately his guilt."* [16] (Emphasis supplied.) In short, police are not to arrest a suspect and then "use an interrogating process at police headquarters in order to determine whom they should charge." [17]

Thus Mallory squarely accords with Upshaw v. United States [18] where the "petitioner was illegally detained for at least thirty hours for the very purpose of securing these challenged confessions." [19] Similarly, Mallory is to be reconciled with United States v. Carignan [20] which explained that "Mitchell's confession, made before commitment, but also before his detention had been illegally prolonged, was admitted as evidence because it was not elicited 'through illegality.' The admission, therefore, was not 'use by the Government of the fruits of wrongdoing by its officers.' Upshaw v. United States, supra, 335 U.S. at page 413, 69 S.Ct. at page 172, [93 L.Ed. 100]." [21]

Applying the rule of Mallory then, as I read it, after making a valid arrest the officers had failed to arraign Trilling

14. Watson v. United States, 1957, 101 U.S.App.D.C. 350, 249 F.2d 106.

15. See, Idem., 101 U.S.App.D.C. at 352, 249 F.2d at page 108, where, in footnote 5, we adverted to the first Watson case, Watson v. United States, 1956, 98 U.S. App.D.C. 221, 234 F.2d 42. There we had ruled there was unnecessary delay when the accused was not arraigned at an hour when the courts were open. We pointed out that the Government had persisted in its illegal detention of the accused for the purpose of securing the challenged disclosures. Thus, his later confessions, involving also reenactment of the crime, had been elicited during a period of illegal detention. However, we had not so ruled as to bar the earlier oral admissions for we could not find that the accused had shown the damaging statements to have been the product of an unnecessary delay in arraignment. Mallory ruled that damaging statements extracted for the purpose of supporting the arrest of a suspect shall not be received. We observed accordingly that Mallory had "rejected" the test we had applied as to Watson's oral admissions. Mallory points out that the police may not arrest upon mere suspicion. One

may be arrested only upon probable cause and then he is to be arraigned that he may be advised of his rights. The circumstances which occur in that interval between arrest and arraignment are controlling. Surely an accused may make a valid confession even if he has not received "judicial caution," but there is to be no "extraction" from him.

16. 354 U.S. at page 454, 77 S.Ct. at page 1359.

17. Id., 354 U.S. at page 456, 77 S.Ct. at page 1360.

18. 1948, 335 U.S. 410, 69 S.Ct. 170, 93 L. Ed. 100.

19. Id., 335 U.S. at page 414, 69 S.Ct. at page 172.

20. 1951, 342 U.S. 36, 72 S.Ct. 97, 96 L. Ed. 48.

21. Id., 342 U.S. at page 43, 72 S.Ct. at page 101. Here, in the Court's footnote 9, it was explained: "In the Mitchell case defendant's confession was given at the police station before commitment, a few minutes after two policemen had jailed him following his arrest on a charge of housebreaking and larceny."

"without unnecessary delay" at an hour when reasonably they could, and as the law requires, should have arraigned him. They detained him for the very purpose of eliciting from him "damaging statements" upon which ultimately to establish his guilt of the six charges of breaking and entering and theft, respectively, involved in the counts under consideration. They had no other evidence to establish his guilt as to these counts.[22] Thus Trilling's detention in order to procure the challenged confessions was illegal. Because that detention was illegal and actually produced the disclosures, the confessions constituted "fruits of wrongdoing." Therefore they were improperly received in evidence, and these convictions must be

Reversed.

■■ BURGER, Circuit Judge, concurring with Judge DANAHER: I think the result reached by Judge DANAHER is compelled by the Mallory case and therefore concur with him, but only because I conclude we are not free to do otherwise. I do this reluctantly because what Judge Prettyman has said makes sense and ought to be the law. The steady expansion of the meaning of "unnecessary delay" by the courts since Rule 5(a) has been in effect suggests to me that this area of the law cannot be developed properly on a case-by-case basis, even though that is sometimes appropriate; Rule 5(a) should be re-examined by the rule making process or by Congress.

BAZELON, Circuit Judge, with whom EDGERTON, Chief Judge, concurs: Appellant was arrested on Sepember 2, 1955, for a housebreaking at the premises of Johnson & Wimsatt, Inc., the crime charged in count three of No. 13069.

Detective Davis, one of the two arresting officers, testified that they arrested him between 5:00 and 5:30 A.M. and that they questioned him, in an attempt to obtain a confession, for an hour or an hour and a half, commencing in the police car en route to headquarters and continuing after arrival. They made no attempt to bring appellant before a committing magistrate as required by Rule 5(a), Fed.R.Crim.P. Being unsuccessful in their attempts to obtain a confession, they booked appellant at about 7:40 A.M. on an "open charge." (R. 201–02, 213–14.)

Detective Trammelle, the other arresting officer, briefing Detective Sergeant Friel, a member of the next shift, preparatory to going off duty at 8:00 A.M., told him that appellant had already been "made" on the Johnson & Wimsatt charge,[1] but, despite questioning, had refused to confess. (R. 86, 951–52.) The new shift also made no attempt to comply with Rule 5(a). Instead, Detective Sergeant Friel took over the questioning and at 8:45 A.M., after about a half hour of additional questioning, in which he pointed out to appellant "that they had made him on fingerprints and he was foolish to stand there and try to beat a case like that," appellant finally confessed the Johnson & Wimsatt crime. (R. 611–12, 951–52.) He had then been held more than three hours.

Thereafter, beginning at about 10:00 A.M., appellant was questioned by relays of other officers about the crime he had already confessed and also some fifteen unsolved housebreakings and an unsolved homicide.[2] That questioning elicited additional admissions about the Johnson & Wimsatt crime and oral confessions of the other crimes involved in this appeal

---

22. They subjected Trilling to prolonged inquisition, including a lie detector test, as to his possible complicity in a murder charge. The police had no evidence whatever on this score, and, indeed, the officers were satisfied that his answers in the polygraph test completely exculpated him as a suspect in the murder case.

1. The arresting officers had seen appellant near the scene of the crime the previous day, at about the time it happened, and, before arresting him, had identified his fingerprints on the inside of a broken window-pane of the building.

2. He was also subjected to a lie-detector test and to physical tests of his hands and clothing for blood stains.

and of several not here involved. At about 2:30 P.M., one of the confessions was reduced to writing and signed. Thereafter, between 3:00 and 4:00 P.M.,[3] appellant was brought before a judge of the Municipal Court, was charged with the one crime he had confessed in writing, waived preliminary hearing and was committed to jail in default of $5,000 bail. Instead of being removed to jail as the commitment required, however, he was taken back to police headquarters, in the company of two deputy marshals, and the police resumed questioning him. In the course of that resumed questioning, which continued until about 10:30 P.M., two more of appellant's oral confessions were reduced to writing and signed.

■ I would reverse all the convictions here involved because, with respect to each, one or more of the above-described confessions were erroneously received in evidence over appellant's objection. In my opinion all were inadmissible.

3. One of the officers testified that his desire to question Trilling about various unsolved crimes on the police books "was one of the reasons that we didn't take him sooner, but when you get to working, * * * you get interested in what you are doing and time flies. Time is relative." (R. 236.)

4. The British rule is similar, though divergences are noted in it from time to time. 1 Taylor, Evidence 556–57 (12th ed. 1931). Judge Taylor writes:
"By the law of this country no person ought to be made to incriminate himself, and no police officer has any right to put searching questions to a person to find out whether an offence has been committed or not by him. If there is evidence of an offence a police officer is justified in putting questions to a suspected person to ascertain whether there are reasonable grounds for arresting him. * * * but after a prisoner is in custody the police have no right to ask him questions, and an admission or confession so obtained is inadmissible."
The divergent attitudes of British judges toward police questioning of arrested persons had caused so much confusion that in 1912, at the request of the Home Office, the King's Bench Judges

### The Pre-Commitment Confessions

The duty of an arresting officer under Rule 5, Fed.R.Crim.P., is to bring the arrested person before a judicial officer without unnecessary delay. As the Supreme Court said in Mallory v. United States, 1957, 354 U.S. 449, 454, 77 S.Ct. 1356, 1359, 1 L.Ed.2d 1479, after arrest

"[t]he next step in the proceeding is to arraign the arrested person before a judicial officer as quickly as possible so that he may be advised of his rights and so that the issue of probable cause may be promptly determined. The arrested person may, of course, be 'booked' by the police. But he is not to be taken to police headquarters in order to carry out a process of inquiry that lends itself, even if not so designed, to eliciting damaging statements to support the arrest and ultimately his guilt."

To me, this means that confessions obtained by questioning an arrested person before thus arraigning him are not admissible in evidence.[4]

promulgated a series of rules. These rules, known as the Judges' Rules, were supplemented in 1918. Report of the Royal Commission on Police Powers and Procedure, Cmd. No. 3297, at 70–71 (1929) ; Taylor, op. cit. supra, 557–59. The Judges' Rules were designed merely as a restatement of existing law, but, to the extent there were variances, the Rules served a harmonizing purpose. Royal Commission Report, supra, 70–71. The Court of Criminal Appeal, in Rex v. Voisin, L.R. [1918] 1 K.B. 531, 539, noted that, though the Rules are "administrative directions" rather than "law," the police should enforce them, "for statements obtained from prisoners contrary to the spirit of these Rules may be rejected as evidence by the Judge presiding at the trial."
Rule 3 of the Judges' Rules provides that "Persons in custody should not be questioned without the usual caution being first administered." Rule 7 provides that "A prisoner making a voluntary statement must not be cross-examined, and no questions should be put to him about it except for the purpose of removing ambiguity in what he has actually said. * * *" These two rules left it ambiguous whether the police might question persons in custody after first

The various confessions appellant made before he was taken to the Municipal Court were therefore inadmissible. I see no reason for distinguishing in this respect between the one confession made at 8:45 A.M., and the several made between 10:00 A.M. and 2:30 P.M. That the 8:45 A.M. confession was obtained before the beginning of the business day does not make it admissible. As we pointed out in Akowskey v. United States, 1946, 81 U.S.App.D.C. 353, 354, 158 F.2d 649, 650 "both by law and practice" a prisoner may be brought before a committing magistrate "at any hour." The prosecutor in his oral argument before us in Mallory v. United States, 104 U.S.App.D.C. ——, 259 F.2d 796, conceded that a confession is not made admissible merely because it is obtained at an hour which is inconvenient for arraignment. In that case, however, he successfully argued that it was permissible to hold the prisoner at police headquarters from the time of his arrest at 8:00 P.M. until some time before noon of the next day without arraigning him and to question him and obtain a confession during this period of delay of arraignment. Similarly here he argues that it was permissible to put off appellant's arraignment from his arrest at 5:00 or 5:30 A.M. until between 3:00 and 4:00 P.M. and to question him and obtain confessions during that period of delay. Both here and in the Mallory case, it should be noted, the police were dealing with an ignorant and friendless prisoner. When it comes, however, to a prisoner who is not ignorant and friendless, the Government

cautioning them. As a consequence divergent practices continued, some police construing the rules to permit it and others hearkening to the counsel of Judge Cave in Regina v. Male, (1893) 17 Cox C.C. 689, that it is the duty of the officer who has placed a suspect in custody "to keep his mouth shut and his ears open." The Royal Commission concluded in 1929: "It is the clear intention of the law that a prisoner who wishes to unburden his soul should first be told he is not bound to do so, and then be allowed to say what he wishes, no more and no less." Royal Commission Report, supra, 65. And it recommended "a rigid instruction to the Police that no questioning of a person in custody, about any crime or offence with which he is or may be charged, should be permitted" except for "questions to remove elementary and obvious ambiguities in voluntary statements. * * *" Id. at 65, 74. In accordance with this recommendation, the Home Office, with the approval of the Judges, issued a circular to the police in July 1930 stating: "Rule (3) was never intended to encourage or authorize the questioning or cross examination of a person in custody after he has been cautioned, on the subject of the crime for which he is in custody, and long before this Rule was formulated, and since it has been the practice for the Judge not to allow any answer to a question so improperly put to be given in evidence * * *." The circular went on to authorize, after proper caution, questioning for the purpose of resolving ambiguities in a voluntary statement. Taylor, op. cit. supra, 559; Prisoners' Statements, 6 Police Journal 342, 355 (1933).

In the first half of the nineteenth century most British judges had admitted "voluntary" confessions obtained through questioning arrested persons. The trend to the present rule started shortly after the enactment in 1849 of 11 and 12 Vict. c. 42, § 18, which revised the procedure for examination before a magistrate, providing that, before asking the accused whether he wishes to make a statement, the magistrate is required, as under our Rule 5, to advise him that he is not obliged to do so and that anything he says may be used against him. See Lefroy, L.C.J., dissenting in Regina v. Johnston, 15 Ir.C.L. 66 (1864). Professor Wigmore believes that the present British rule deeming involuntary any confession obtained through questioning an arrested person is based on the spirit of the 1849 statute. 3 Wigmore, Evidence 287, 292–93 (3d ed. 1940). The McNabb-Mallory rule in the United States is similarly based on the spirit of our Rule 5. Neither in our Rule nor in the British statute is there any specific injunction against admitting in evidence the arrested person's answers to a police officer's questions. Both, however, establish a judicial procedure for receiving the arrested person's *voluntary* statements and both are read to deprive the police of the right to use statements they obtain by questioning him in disregard of the required procedure.

has sometimes found it both proper and possible to bring him before a committing magistrate in the middle of the night. Thus, according to an undisputed affidavit, in the recent Hoffa case, the defendant was arrested at about 11:00 P.M. and was brought to the United States Courthouse at about midnight. His request that his counsel be called was complied with and counsel arrived at about 12:30 A.M. At about 1:00 A.M., the United States Commissioner arrived and the commitment proceeding began.[5]

Nor is the 8:45 A.M. confession admissible on a theory that the police have a right to *some* questioning of the accused before arraigning him. The Government points to the Supreme Court's statement in Mallory that "The duty enjoined upon arresting officers to arraign 'without unnecessary delay' indicates that the command does not call for mechanical or automatic obedience." 354 U.S. at page 455, 77 S.Ct. at page 1359, 1 L.Ed.2d 1479. From this it is argued that circumstances may justify questioning the

accused before arraigning him. The conclusion does not follow from the premise. What the Court meant by the quoted language is made plain by the example it immediately gave: "Circumstances may justify a brief delay between arrest and arraignment, as for instance, where the story *volunteered* by the accused is susceptible of quick verification *through third parties*.[6] But the delay must not be of a nature to give opportunity for the extraction of a confession." Ibid., emphasis supplied.[7] Even if a *"brief delay"* in arraignment may sometimes be proper [8] or even inevitable,[9] it does not follow that the police may question the prisoner during the delay for the purpose of getting a confession. This is especially true when the purpose of the delay itself is to provide an opportunity for the questioning.

Criminal cases involve a conflict between the defendant's personal rights and what the police and the prosecutor think is effective law enforcement. Any consideration of that conflict must start

5. See United States v. Hoffa, Crim. No. 294–57 (D.D.C.), affidavit of James R. Hoffa, dated April 19, 1957, in support of motion to dismiss.

6. It has sometimes been suggested that Mallory would require the immediate arraignment and formal charging of an arrested person who claims to be innocent and whose innocence could be established through an alibi witness if the police had time to investigate before arraignment. That construction of Mallory, as is evident from the language quoted in the text, is clearly erroneous. What Mallory prevents the police from doing is to postpone arraignment for the purpose of questioning the prisoner himself in order to persuade him to abandon his claim of innocence.

7. Since it is the "opportunity for the extraction of a confession" that Mallory forecloses, rather than the extraction itself, we need not determine whether the circumstances of the questioning in a particular case show coercion. If that inquiry were relevant under Mallory, the Supreme Court would have accomplished nothing by its line of decisions from McNabb to Mallory, for proof of coercive questioning would require exclusion of a

confession quite apart from those decisions.

8. See, however, D.C.Code, § 4–140. While Rule 5(a) requires that an arrested person be taken before a judicial officer "without unnecessary delay," the cited provision of the District of Columbia Code, authorizing a member of the Metropolitan Police to make arrests without warrant in specified situations, requires that "such member of the police force *shall immediately, and without delay,* upon such arrest, convey in person such offender before the proper court, that he may be dealt with according to law." Emphasis supplied. When a policeman makes an arrest upon a warrant, the warrant must be executed "according to the terms thereof." D.C.Code, § 4–138. Warrants issued by judges of the Municipal Court for the District of Columbia require the officer to bring the arrested person before the court "forthwith."

9. As, for example, where, at the time of arrest, the prisoner is physically or mentally incompetent. See *my* dissenting opinion in Green v. United States, 1956, 98 U.S.App.D.C. 413, 236 F.2d 708, reversed on other grounds 1957, 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199.

with the proposition that the defendant is presumed to be innocent until due process of law finds him guilty. That process is not the province of the police. Their function is to arrest the defendant and bring him before a judicial authority.

Rule 5 and its predecessor statutes, which were the basis of the McNabb rule, are an expression of the deep antipathy of Anglo-American law for any imprisonment except by judicial authority. Centuries ago in England, in resistance to the royal practice of arbitrary imprisonment, the rule was developed that a person may be imprisoned only by order of a magistrate after a hearing which demonstrates his probable guilt of a specific charge. Many years ago, our Supreme Court said: "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." Union Pacific Ry. Co. v. Botsford, 1891, 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734.

A warrant of arrest issued under Rule 4, Fed.R.Crim.P., is "authority of law" for a policeman to abridge the individual's liberty. And, as has often been held, so is the existence of probable cause to believe the individual guilty of an offense which has occurred. Under either authority, however, the policeman's custody of the individual lasts only long enough to bring the suspect before a magistrate. The warrant usually commands that to be done "forthwith." If the arrest is made without a warrant, Rule 5 commands that it be done "without unnecessary delay." The reason for these commands is that the object of the arrest is to assure that the defendant will be present to respond to a charge at the proper time. Arrest is not for the purpose of providing an opportunity to question the defendant. Five members of the Bill of Rights Committee of the American Bar Association, in "A Memorandum on the Detention of Arrested Persons" written in 1944, reported:

> "We have found no indication that there was ever any law in the United States or England authorizing a prisoner to be detained for the purpose of facilitating investigation. Exactly the contrary has been repeatedly declared by state judges interpreting prompt production statutes similar to the Acts of Congress already quoted [those involved in McNabb]." [10]

In Mallory, the Supreme Court said:

> "Presumably, whomever the police arrest they must arrest on 'probable cause.' It is not the function of the police to arrest, as it were, at large and to use an interrogating process at police headquarters in order to determine whom they should charge before a committing magistrate on 'probable cause.'"

That there may be no arrest without probable cause is a fundamental principle of liberty. And so well settled is it that we never even hear it questioned today. The police never question the principle. But, as the Supreme Court has said in regard to a different subject "we would have to be that 'blind' Court * * * that does not see what '[a]ll others can see and understand' not to know that" the police do not always follow it. Rumely v.

---

10. The Memorandum is printed as an accompaniment to "A Statement by the Committee on the Bill of Rights of the American Bar Association on H.R. 3690, May 15, 1944." The quoted language appears at p. 12. The Committee, transmitting the memorandum to the chairman of the House Judiciary Subcommittee studying the legislation, stated: "This memorandum, while not to be understood as a statement on behalf of the Bill of Rights Committee, is transmitted to you herewith because we believe that it fairly and helpfully presents the subject of detention after arrest in relation to both civil liberties and the efficient suppression of crime." Id. at iii.

See also National Commission on Law Observance and Enforcement (Wickersham Commission), Report No. 11, Lawlessness in Law Enforcement 34, n. 41 (1931).

United States, 1953, 345 U.S. 41, 44, 73 S.Ct. 543, 545, 97 L.Ed. 770. As a Presidential Commission pointed out in 1947, the number of cases of police violation of such civil rights reaching the courts shows "that improper police conduct is still widespread, for it must be assumed that there are many instances of the abuse of police power which do not reach the courts. Most of the victims of such abuses are ignorant, friendless persons, unaware of their rights, and without the means of challenging those who have violated those rights."[11]

The impact of crime is always frightening. But a police system operating above the law is even more frightening, for it tends to destroy the very roots of the social order by bringing into disrepute the whole machinery of law enforcement. To defend against crime, society can increase the number of police; it can improve police efficiency; it may find that an earnest attempt to seek out and eliminate the conditions which breed crime is an even more effective defense. To defend against police lawlessness, we must make it unprofitable.[12] Society cannot tolerate "abuses of power by 'inefficient and delinquent officials'—sometimes from excessive but misguided zeal, sometimes to win applause by producing a victim when popular clamor demands the solution of a crime. Respect for law, which is the fundamental prerequisite of law observance, hardly can be expected of people in general if the officers charged with enforcement of the law do not set the example of obedience to its precepts." National Commission of Law Observance and Enforcement (Wickersham Commission), Report No. 11, Lawlessness in Law Enforcement 1 (1931).

The rule that excludes confessions obtained by questioning an arrested person before arraignment does not, of course, prevent either the prosecutor or the police from putting questions to a suspect before they arrest him. Nor, if he is willing, are they forbidden to question him in jail after he has been committed, or in his home if he has been released on bail. But they may not, at any time, require him to answer. He never loses his constitutional right to remain silent. The Fifth Amendment forbids compelling him to speak against himself not only at his trial, but also in such formal pretrial proceedings as grand jury investigations, Counselman v. Hitchcock, 1892, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110, and indirectly, i. e., by excluding involuntary confessions, in such informal ones as police interrogations. Bram v. United States, 1897, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568. An interrogation at police

11. "To Secure These Rights," The Report of the President's Committee on Civil Rights 25 (1947).

It is undoubtedly safe to assume, moreover, that for every case where a challenge to police illegality becomes possible when the accused is brought before a judicial tribunal, there are many where the arrested person is ultimately discharged by the police without ever being formally charged. In a recent television talk, for example, District Commissioner Robert E. McLaughlin criticized the Metropolitan Police for going "too far" in rounding up ninety suspects in a precinct-wide dragnet operation. They were seeking three "stocky" young negroes who had robbed a restaurant and one of whom had punched a waitress. The juveniles who were arrested were released to their parents. Sixty-seven of the arrested persons were held overnight at headquarters, all being released the next day when it appeared there was no case against them. Another man, not one of the ninety arrested, was later charged with the crime. Police Chief Robert V. Murray agreed that the roundup had been carried "a bit too far," but said that he had issued no written orders to prevent similar roundups, "because every crime must be investigated on its own merits." Washington Daily News, January 21, 1958, p. 5, col. 1; Washington Post-Times Herald, March 3, 1958, p. B–1; Washington Evening Star, March 3, 1958, p. B–1.

12. Civil suits or criminal prosecutions against lawless officers of the law cannot be relied upon as an effective sanction. See Nueslein v. District of Columbia, 1940, 73 App.D.C. 85, 90, 115 F. 2d 690, 695; In re Fried, 2 Cir., 161 F. 2d 453, 459–460, 1 A.L.R.2d 996, certiorari dismissed 1947, 332 U.S. 807, 68 S. Ct. 105, 92 L.Ed. 384.

headquarters is all too frequently "a process of inquiry that lends itself, even if not so designed, to eliciting damaging statements * * *." Mallory v. United States, 354 U.S. at page 454, 77 S.Ct. at page 1359. Before the arrested person is arraigned, he "is under the exclusive control of the police, subject to their mercy, and beyond the reach of counsel or of friends." Carignan v. United States, 1951, 342 U.S. 36, 46, 72 S.Ct. 97, 102, 96 L.Ed. 48, concurring opinion of Mr. Justice Douglas. Arrest and the atmosphere of a police station automatically instill in the prisoner a fear which conduces to the extraction of damaging statements, particularly when he is ignorant of his rights [13] and unfortified by counsel.

At arraignment, the magistrate must advise him (1) that he has a right to a preliminary hearing at which the police must prove that there is probable cause to hold him; (2) that he has a right to counsel; (3) that he is free to refuse to speak; and (4) that any statement he makes may be used against him. Undoubtedly the police machine operates in lower gear after this advice has been given. The United States Attorney's office complained in another case, "We would find the place crawling with attorneys telling him 'you don't have to talk to the police.'" Watson v. United States, 1956, 98 U.S.App.D.C. 221, 226, 234 F.2d 42, 47. The utility for police purposes of questioning an arrested person before arraigning him lies in the element of compulsion which results from his fear, in combination with his ignorance, [14] even when no violence is used

---

13. The United States Attorney's brief in the instant case informs us that appellant was advised by the police "that he did not have to make any statements and that any that he did make could be used against him." The record shows, however, that this advice was not given until the police had obtained oral confessions of all the crimes and the first written confession was being prepared. (R. 341-42.)

Even a timely advisory statement by the police would not excuse failure to bring the prisoner before a committing magistrate as Rule 5(a) requires. Rule 5(b) requires the magistrate to inform the accused of his rights. If a police statement were a valid substitute for compliance with the rule, we would be faced, in case after case, with practically insoluble conflicts of testimony as to whether or not the statement was in fact given.

14. In this connection, see the testimony of Major Edward J. Kelly, Superintendent of the Metropolitan Police, in the Hearings before Subcommittee No. 2 of the House Committee on the Judiciary, on H.R. 3690, 78th Cong., 1st Sess., at pp. 5-6 (1943):

"Mr. Towe. The fact of the matter is, Chief, if you take a man, an alleged defendant, before a magistrate and make a charge against him, even if he is held, you lose control of that man for some time, do you not?

"Major Kelly. That is absolutely true.

"Mr. Towe. Is he put in jail, or is he free to do as he pleases?

"Major Kelly. He is turned over to the United States Marshal and committed to jail.

"Mr. Towe. And you and your investigating officers do not have whatever advantage there may be in having that man with you for sometime?

"Major Kelly. That is exactly correct.

"Mr. Cravens. What advantages would you have accruing to you by having him for some time? What do you mean by that?

"Major Kelly. I mean that when you take a person into custody for the investigation of a commission of a serious crime, and the minute you have said person arraigned before a United States commissioner or magistrate, and he is then turned over to the United States marshal or committed to the jail for the purpose of being held, you cannot properly go any further with your investigation. The individual so charged or held, when he arrives at the jail or place that he is committed, receives all kinds of advice and information from other persons held in jail—namely, those that are referred to as tier lawyers—and then it is absolutely impossible to proceed further in a proper manner with the investigation. In other words, the prisoner is entirely out of your control and custody, and you are then handicapped to the greatest extent by the ruling which we must now undergo since the McNabb decision was handed down.

and no threats are either expressed or purposely implied. The argument for permitting the use of confessions obtained by questioning before arraignment therefore comes to this, that society's interest in convicting the guilty justifies the use of a degree of compulsion against the guilty and the innocent alike.[15] But however effective in catching criminals fear and ignorance may be,[16] the Fifth Amendment and Rule 5 bar their use because they cannot be reconciled with a civilized community's minimum standards of fairness.[17] "Rights intended to protect all must be extended to all, lest they so fall into desuetude in the course of denying them to the worst of men as to afford no aid to the best of men in time of need." Goldman v. United States, 1942, 316 U.S. 129, 142, 62 S.Ct. 993, 999, 86 L.Ed. 1322 (dissenting opinion of Mr. Justice Murphy).

"Mr. Cravens. I get the impression from your remarks that the purpose of not taking him before the magistrate is to keep him from getting advice.

"Major Kelly. No, sir; that is not true. I believe that every person should be guaranteed the right provided under the Constitution of the United States, but at the same time I believe, and I am confident, that when a person is charged with the commission of a serious crime, there should not be any interference with the police or detectives until such case is brought to a definite conclusion. I do not mean that a person should be held forever, but should be allowed to stay in the custody of the police for a reasonable time until the investigation is concluded."

15. 3 Wigmore, Evidence 93 (3d ed., 1957 Supp.):

"It is believed that the following statements of fact are correct, at least for hundreds of cities and in large classes of cases:

"(1) The use of *physical beating-up*, in variant degrees of brutality, not only is practised, but is deemed justifiable, on the ground of necessity. The necessity is said to exist chiefly in the cases of notorious gangsters and syndicated rascals, where direct testimony or adequate circumstantial evidence is not expected to be available; and the practice is *said* to be limited to such cases.

"(2) The use of *mental strain*, by continuous interrogation, without food and without rest, by relays of officers, is equally prevalent, and is equally deemed justifiable; nor is it limited to the foregoing classes of cases.

"(3) The use of *false pretenses*, deceiving the suspect into believing that silence will no longer avail, is habitually used, and is deemed justifiable. By 'false pretenses' is meant such assertions as 'Your pal has told us the whole story and blames you, so you might as well tell your story and refute him if you can'; or 'We have just found the goods where you hid them, and we have a complete case; so you may as well come clean'; the foregoing assertions being false.

"This frank justification of habitual use of falsities, where a person deemed guilty has been arrested, leads one to infer that a false denial of having used brutality, when inquiry is made at the trial, would also be deemed justifiable, for mutual protection by the participants.

"(4) The use of the foregoing methods, when candidly justified, is placed on the ground that in many cases it would be impossible to obtain other evidence of any sort sufficient to take the case to a jury, and that therefore a *confession is indispensable*, if such persons are to be brought to justice at all. This doctrine approximates almost exactly the legal rule, obtaining in the Middle Ages in Continental law down to the time of the Code Napoleon, that no person could be condemned until he had confessed; which of course led to the lawful and habitual use of torture to complete the final formality. A police belief that a confession is indispensable, and that it is therefore obtainable by the above methods, naturally tends to laxity in searching thoroughly for other evidence." [Emphasis in original.]

16. The experienced, hardened offender and the member of the criminal "syndicate" are generally not in ignorance of their rights and are unlikely to confess under the pressure of police detention. Fear is likely to be an effective tool only in the case of the ignorant and inexperienced. See text at note 5, supra.

17. Since the violation of Rule 5 makes the confessions inadmissible, we need not consider whether, in the absence of the rule, the Constitution itself would bar them. Upshaw v. United States, 1948, 335 U.S. 410, 414 note 2, 69 S.Ct. 170, 93 L.Ed. 100.

It is suggested that the 8:45 A.M. confession is admissible under United States v. Mitchell, 1944, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140. But I find it impossible to conclude that appellant "promptly and spontaneously admitted his guilt," Upshaw v. United States, 335 U.S. at page 413, 69 S.Ct. at page 171, 93 L.Ed. 100, explaining United States v. Mitchell, supra, from a record showing that he denied guilt when he was arrested and continued to deny it under questioning by two relays of officers at police headquarters. Cf. Perry v. United States, 102 U. S.App.D.C. 315, 253 F.2d 337. He did not confess until he had been held three hours and questioned at least an hour and a half.[18]

It is also suggested that, even if receiving the 8:45 confession in evidence was error, the error was not prejudicial, because there was ample other evidence to justify the conviction. The jury knew that appellant had been seen near the scene of the crime and that his fingerprints had been found on the broken window. But also before the jury and looming large in the prosecutor's summation were appellant's confession of the crime and the physical evidence of the tools used in the crime, which evidence the police obtained as a result of the confession. Weighing the evidence is a jury function. I am unable to say that the confession and the derivative physical evidence did not tip the scales in favor of conviction. See Krulewitch v. United States, 1949, 336 U.S. 440, 445, 69 S.Ct. 716, 93 L.Ed. 790. For that reason alone, I would disagree with those of my colleagues who would hold that receiving the confession in evidence was not prejudicial error. But there is also another reason which makes receiving the confession reversible error. Without reaching the question whether a violation of Rule 5 is also a violation of a constitutional right,[19] I think the same consideration that would require reversal if the point were constitutional[20] requires reversal even if it is not. That consideration is that a right may be "too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial." Glasser v. United States, 1942, 315 U.S. 60, 76, 62 S.Ct. 457, 467, 86 L.Ed. 680. The right to speedy arraignment before a magistrate is such a fundamental and absolute right and, in formulating the rule of evidence excluding confessions obtained in violation of

---

18. The later pre-commitment confessions—those made between 10:00 A.M. and 3:00 P.M.—present an *a fortiori* case, for they were the result of more hours of detention and additional rounds of questioning. No amount of dissection of the facts can support a conclusion that those confessions were the spontaneous outpourings of a garrulous suspect eager to tell the truth. Nor does the record support a conclusion that the questioning which produced the confessions consisted of a mere reading of an inventory of unsolved crimes with appellant supplying a "Yes" or "No" as to each. Detective Sergeant Winter, who did the questioning, admitted that he questioned appellant about each of the crimes, "some at more length than others." (R. 237.)

It is clear that appellant was still an unwilling penitent and that the police were by no means satisfied that he was giving frank and truthful answers. They did not give up simply because he said "No." Officer Winter testified, for example, that he managed to prove appellant guilty of one of the crimes, although he denied it and that the police, despite his denials, still believe him guilty of some others. (R. 229–33.) As to another of the crimes, appellant began by denying it, but admitted it after Officer Winter urged him a bit. The urging, according to the officer, consisted of "Come on, now, son; tell me the truth about that." (R. 230.) Officer Winter's Characterization of the questioning was: "I kept him there as long as I reasonably could without violating his rights, *to ascertain whatever I could from him.*" (R. 236, emphasis supplied.) The officer's idea of how long he could keep a suspect under questioning without violating his rights was somewhat elastic. See supra note 3. By Judge Keech's characterization, appellant "was questioned and questioned at substantial length." (R. 234.)

19. See note 17, supra.

20. See, e. g., Lyons v. State of Oklahoma, 1944, 322 U.S. 596, 597 note 1, 64 S.Ct. 1208, 88 L.Ed. 1481.

that right, the Supreme Court was "guided by considerations of justice not limited to the strict canons of evidentiary relevance." McNabb v. United States, 318 U.S. at page 341, 63 S.Ct. at page 613, 87 L.Ed. 819.

### The Post-Commitment Confessions

The confessions obtained after appellant had been arraigned before a magistrate and taken back to police headquarters were inadmissible for three reasons.

1. They merely supplemented or reduced to writing inadmissible pre-commitment confessions. It has never been held that "making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed." United States v. Bayer, 1947, 331 U.S. 532, 541, 67 S.Ct. 1394, 1398, 91 L.Ed. 1654.[21] But a confession which is made a few hours after an inadmissible one and while the confessor is still in detention, albeit no longer police detention, and which is inextricably intertwined with the earlier confession, is the fruit of the earlier one and equally inadmissible.

2. These later confessions were obtained in the course of violating the magistrate's commitment order. A confession made while in lawful detention after commitment may be admissible. See United States v. Carignan, 1951, 342 U.S. 36, 72 S.Ct. 97, 96 L.Ed. 48. But appellant's detention at police headquarters after a magistrate had ordered him committed to jail was not lawful detention. "The complicated process of criminal justice is * * * divided into different parts, responsibility for which is separately vested in the various participants upon whom the criminal law

relies for its vindication." McNabb v. United States, 318 U.S. at page 343, 63 S.Ct. at page 614. Pointing out that the apprehension of suspects is a police function and their detention a judicial function, the Court held that the prisoner must be removed from police to judicial control as soon after arrest as possible.[22] Rule 5 embodies that objective. 11 Cyc. Fed.Procedure §§ 40.40, 40.50 (3d ed. 1952). It requires the magistrate before whom the prisoner is brought either to discharge him or to "hold him to answer in the district court," admitting him to bail as the rules provide. In this district, if the magistrate decides that the prisoner should be held he is authorized to commit him to the District of Columbia Jail. The magistrate may not lawfully return him to the custody of the police. He did not in this case. He properly committed appellant "to jail." The marshal violated the magistrate's order by taking appellant back to police headquarters for hours of further questioning. The United States Attorney argues that the marshal could lawfully take him back as long as he did not surrender custody to the police. But this argument rests on the false assumption that the magistrate had committed the prisoner to the custody of the marshal. Since appellant's detention violated the commitment order and had no other lawful basis, it was unlawful.

3. The record does not show that the magistrate informed appellant, as Rule 5 requires, of his constitutional right to remain silent. The purpose of a Rule 5 arraignment is two-fold: that "the arrested person * * * may be advised of his rights and * * * that the issue of probable cause may be promptly determined." Mallory v. United States, 354 U.S. at page 454, 77 S.Ct. at page

---

21. The later confession in the Bayer case was made more than six months after the inadmissible confession and at a time when the only restraint on the confessor was that he could not go beyond the limits of a military base without leave.

22. Metropolitan Police officials have testified that before McNabb the marshal used

to permit them to take the defendant back to headquarters for further questioning after commitment, but that since McNabb they have had to pursue their questioning at the jail. Hearings before Subcommittee No. 2 of the House Committee on the Judiciary, on H.R. 3690, 78th Cong., 1st Sess., 5–7, 10, 47, 48 (1943).

1359, 1 L.Ed.2d 1479. By waiving preliminary hearing, appellant may have consented to being detained without a determination of probable cause. But there is no suggestion that he consented, or could validly have consented, to the magistrate's failure to inform him of his rights.

The right to refuse to answer questions is useless unless one knows he has it. A prisoner who has been told by a magistrate that he need not speak and that he is entitled to a lawyer and to a preliminary hearing and who, after adequate consultation with counsel, either has or waives a preliminary hearing, is in a very different position from a prisoner who has not been told of his rights and, after a perfunctory conversation with a lawyer who knows nothing of his case, waives preliminary hearing and is committed to jail. In the latter case, the prisoner is almost as much exposed to the illegal extraction of confessions after commitment as before.

Appellant testified that when he was taken to the Municipal Court the judge offered to assign a lawyer, but that no one told him he had a right to remain silent under questioning. (R. 193.) The prosecution does not challenge this testimony. Nor does the only Municipal Court paper filed in the District Court show that appellant was advised of his rights.[23] Even if he had been fully advised of his rights by a court-appointed lawyer at his Rule 5 arraignment,[24] this would have been no adequate or legal substitute for the advisory statement which the magistrate was bound to give him. Moreover the circumstances of the consultation with counsel virtually precluded any possibility that it could aid appellant. He testified *without contradiction* that the judge asked him if he wanted a lawyer and, when he said he did, appointed a man sitting in the courtroom. The judge told the lawyer to go outside and talk to appellant. " * * * they sent me out one door, and he went out the other door, and I was in the bull pen in back, and he came out and lit a cigarette, and by the time I walked over there, he was ready to come back in, and he said something to me, but I don't remember what he said, and we came on back into, in front of the judge." (R. 1180, 1182.)

**23.** Rule 5(c) requires the magistrate to transmit to the Clerk of the District Court "all papers in the proceeding and any bail taken by him." The only paper thus transmitted here was the complaint form upon which was endorsed an entry that an atorney had been appointed and a commitment of the appellant "to jail in default of recognizance in the sum of $5,000.00 * * *."

**24.** Rule 5(b) requires that the arrested person be advised "of his right to retain counsel" and be allowed "reasonable time and opportunity to consult counsel." It does not in terms require assignment of counsel to indigent persons who find it impossible to retain counsel. Rule 44 calls for assignment of counsel to represent a defendant "at every stage of the proceeding" if he wishes counsel and cannot obtain his own. The Advisory Committee Note on Rule 44 states that the rule is not intended to give the defendant a right to assignment of counsel at the preliminary proceedings under Rule 5. If Rule 44 accurately restated the then existing law as to right to counsel, as the Advisory Committee says it was meant to do, it may be that an indigent accused committed to jail by a magistrate to await trial, without having had counsel, may not successfully seek release on the ground that his Sixth Amendment rights have been denied him. A contrary result may perhaps be indicated by recent Supreme Court opinions to the effect that due process forbids discrimination against accused persons by reason of poverty. See Farley v. United States, 1957, 354 U.S. 521, 77 S.Ct. 1371, 1 L.Ed.2d 1529; Johnson v. United States, 1957, 352 U.S. 565, 77 S.Ct. 550, 1 L.Ed.2d 593; Griffin v. People of State of Illinois, 1956, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891.

But even if the rules and the Constitution permit temporary detention of an accused person who has not been given counsel, it does not follow that a confession obtained from him during such detention is admissible. Over and above the Sixth Amendment question involved in his detention is the question whether receiving his confesson in evidence amounts to compelling him to testify against himself in violation of his Fifth Amendment right.

Thereupon, appellant waived preliminary hearing and was committed to jail in default of bond. He did not know the lawyer's name and never saw him again. (R. 1183.) The testimony of the officer who took appellant to court for commitment tends to corroborate appellant's account of the commitment proceedings.[25] The Government made no attempt through this witness to contradict any part of appellant's account. Nor did the Government call any other witness to challenge appellant's testimony, or even try to challenge it by cross-examination. The Government does not even challenge the statement of appellant's present counsel that efforts to locate the commitment lawyer have been unavailing, because his name, as given on the Municipal Court complaint form,[26] does not appear in any directory. A confession obtained by questioning a prisoner who has not had the benefit of the substance as well as the form of the proceeding which is designed to inform him of his rights,[27] may not be used in evidence against him.

If I have said more in the foregoing than is necessary for the disposition of this case, it is because I think the constantly recurring problems involved in the case warrant it.

Despite the length of this opinion, moreover, I think it desirable to mention one additional error committed by the lower court in one of these cases. In No. 13212, the trial judge opened his charge to the jury with the following:

"Ladies and gentlemen of the jury, this case has taken a considerable time to try. Actually the amount of evidence introduced is small and the case is simple. We have spent perhaps more time on it than the evidence warrants. But the reason for that is this, that under our system of administering justice we give everyone a full hearing before the case is decided. Sometimes this results in what seems to be an unnecessary consumption of time; but that is our method of administering justice. *The books sometimes say that due process of law is the process that hears before it condemns. So at the risk of what seemed to be an unnecessary consumption of time, you have given the defendant a very full hearing and then proceed to the decision.*" [Emphasis supplied.]

This instruction could have been understood as implying that the trial was only a formality.

FAHY, Circuit Judge, and WASHINGTON, Circuit Judge, would reverse the convictions on all counts and remand the cases for new trials on the authority of McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819; Upshaw v. United States, 335 U.S. 410, 69 S.Ct. 170, 93 L.Ed. 100, and Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479.

25. He testified that appellant was "given an attorney to speak to, and he came back and waived his rights to a hearing." (R. 667.)

26. Nor does that name appear in the Municipal Court's roll of attorneys. We know now from Judge Prettyman's investigation that a lawyer with a name of similar sound but different spelling is on that roll, and it now seems probable that he was the commitment lawyer. The fact remains that appellant's present counsel knew nothing of all this, and apparently government counsel did not know it either. The lawyer's testimony about the proceedings at and before commitment was therefore unavailable.

27. I note, merely in passing, that Trilling's uncontradicted and corroborated account of the proceedings in the Municipal Court conforms with a report on that court's practice in Rule 5 proceedings recently made to the District of Columbia Bar Association by its Committee on Criminal Rules and Procedure. It should also be noted, however, that the report and objections thereto lodged by the judges of the Municipal Court and by a number of lawyers frequently appointed by the Municipal Court in commitment proceedings are presently under consideration by the District of Columbia Bar Association.

■ PRETTYMAN, Circuit Judge, with whom WILBUR K. MILLER and BASTIAN, Circuit Judges, agree, concurring in part and dissenting in part: These are convictions in three separate trials, before three different judges and three different juries, for four different robberies involving safe-cracking. I concur in the affirmance of the one judgment of conviction, being the third count in No. 13069, based upon the Johnson & Wimsatt offense. I agree with what Judge Danaher has written concerning that judgment. I dissent from the reversals. As the whole of the day's events should be viewed in considering these problems, I shall discuss all four cases.

The problem centers about the admission of certain confessions. The judgments are being reversed because of the court's understanding of the Mallory case.[1] My study has divided itself into three parts: (1) the opinion and decision of the Supreme Court in Mallory; (2) the facts in the Trilling cases, *i. e.*, the cases at bar; and (3) the application of the rule of Mallory to the facts in Trilling. I divide my opinion accordingly. It will be long, because I disagree with my brethren both vigorously and thoroughly. The matter is important, because it involves several phases of police practices in the apprehension and subsequent trial of criminals.

## I

### The Mallory Case

We should view the opinion and decision in the Mallory case as the Supreme Court viewed the case, not as somebody else viewed, or may view, the facts and the dispute. The victim of the rape had sought help in detaching a hose in a sink in the basement of the apartment house. Mallory was alone in the janitor's apartment; he helped her. Very shortly thereafter a man, who was masked but whose general features were identified as resembling those of Mallory and his two grown nephews, committed the rape in the basement. The woman had heard no one descend the wooden stairs. Mallory disappeared from the apartment shortly after the crime was committed. The Court was of the view that from the early stages of the investigation the police had ample evidence for regarding Mallory as "the chief suspect". It clearly indicated that probable cause for a charge existed from the time of the arrest.

Mallory was arrested the next afternoon between two and two-thirty. He was questioned one way or another until about nine-thirty that night, when he confessed orally, and further until eleven-thirty or twelve-thirty, when he made a written confession. He was not warned or advised of his rights. The signed confession was introduced in evidence against him. The Court said: "The circumstances of this case preclude a holding that arraignment was 'without unnecessary delay.'" And it held: "We cannot sanction this extended delay, resulting in confession".

The detection of the guilty person in a crime usually progresses from one stage to another as the facts are discovered. At first there may be no suspect at all. Then, as the facts are uncovered, a suspicion, but a mere suspicion, develops. No arrest is permitted by law at that point. The police cannot arrest without "probable cause",[2] *i. e.*, reasonable ground for belief that the suspected person is the guilty one.[3] Then, as more facts are revealed, mere suspicion ripens into probable cause. At that point a valid arrest can be made. When the arrest is made, the accused person must be arraigned without unnecessary delay.[4] Sometimes all these various stages happen quickly; sometimes there are long delays between them.

1. Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957).

2. Bell v. United States, 102 U.S.App.D.C. 383, 254 F.2d 82 (D.C.Cir., 1958).

3. Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).

4. Fed.R.Crim.P. 5(a).

When a case develops thus normally, there are three periods of police inquiry which must upon occasion be subjected to scrutiny. The first is before probable cause for an arrest has appeared. The police are then trying to ascertain the identity of the guilty person. The second period is after the arrest and before arraignment. The police, having reasonable grounds for belief that the arrested person is the guilty one, are endeavoring to make certain, or at least more likely, that their belief is correct. The third period is after arraignment. The police then may be tying up loose ends or may still be trying to secure a confession as a handy tool at trial. Mallory dealt specifically with the second, or middle, of these periods. Rule 5(a) of the Federal Rules of Criminal Procedure and the McNabb case[5] also dealt with that problem. I shall therefore deal first with the problem of the period between arrest and arraignment.

The rule is plain: A confession obtained from an accused during a period of unnecessary delay between arrest and arraignment is not admissible against him. The rationale is equally plain. The Supreme Court is concerned, as is this court, about a police practice of holding a person and subjecting him to questioning in order to secure a confession. The concern is realistic. Voluntary confessions are favored by the law; but from the viewpoint of the police confessions are a short and easy route to conviction. The route is alluring, tempting. But across it lies a very real and rugged principle of our concept of the-state-and-the-citizen. The bedrock of the principle is that no man shall be compelled to testify against himself. In Bram v. United States[6] the Supreme Court discussed the subject at length and with copious citations, pointing out that the prohibition

was a protest "against the inquisitorial and manifestly unjust methods of interrogating accused persons". The subject was discussed again in Ziang Sung Wan v. United States.[7] The Supreme Court in McNabb, Mallory, et al., formalized a rule on the matter. Rule 5(a) incorporated the basic requirement. A person held by the police unnecessarily long after arrest, without warning or advice, is under compulsion by the very fact of being held at the place and under those circumstances.[8] The Court blocked that route to confessions.

But the Court did not lay down a mechanical rule. "The circumstances of this case", said the Court, precluded a different holding. The Court used expressions such as: "[H]e [the arrested person] is not to be taken to police headquarters in order to carry out a process of inquiry that lends itself, even if not so designed, to eliciting damaging statements" and "the delay must not be of a nature to give opportunity for the extraction of a confession", "resulting in confession," "tempting utilization of intensive interrogation". The Court said "process" of inquiry, "extraction" of the confession, "intensive interrogation". The Court did not preclude *any* question or specify any time. It sought to convey an idea—an idea of inquisitorial injustice, delay with a result or an objective. The character of the questioning is a key factor. Matters of fact are involved, not matters of semantics or of comptometer calculation.

As I read the cases, the Supreme Court holds that whether a given delay between arrest and arraignment is unnecessary depends upon a realistic appraisal of the circumstances. In each of the line of cases McNabb, Upshaw,[9] Mallory, the Court described and then emphasized as critical the facts and circumstances. In

5. McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943).

6. 168 U.S. 532, 540 et seq., 18 S.Ct. 183, 42 L.Ed. 568 (1897).

7. 266 U.S. 1, 45 S.Ct. 1, 69 L.Ed. 131 (1924).

8. See Chambers v. State of Florida, 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716 (1940), and Ashcraft v. State of Tennessee, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192 (1944).

9. Upshaw v. United States, 335 U.S. 410, 69 S.Ct. 170, 93 L.Ed. 100 (1948).

McNabb the Court said "in the circumstances disclosed here".[10] In Upshaw it stressed the facts of the detention and the questioning. In the Fourteenth Amendment cases the Court has always emphasized the circumstances.[11]

I refuse to agree that the Supreme Court in Mallory established a bare time rule to govern the admission of confessions. It has never said, or intimated, that a confession obtained by one hour of intensive pressure is admissible but one obtained by two hours of casual inquiry is not admissible. And it has not said that a confession obtained at eight-fifty o'clock in the morning is admissible but one obtained at nine-ten the same morning is not. I can conceive of no rationale which would support any such rule; in this I suppose I am in disagreement with the Uniform Arrest Act.

The word in the Rule is "unnecessary". Unnecessary for what? I think the Rule does not preclude a reasonable delay, reasonably essential to proper—emphasize "proper"—police procedure. The Rule does not prohibit any and all delay; it prohibits unnecessary delay. It does not forbid all delay except the minimum of minutes necessary physically for the routine requirements of transportation, preparation of papers, arousing a magistrate during off-hours, identification, etc. The term "unnecessary delay" has a content of substance, embodying allowance for proper police procedure. Reasonable and proper police action is not precluded. A delay is to be judged unnecessary-or-not upon a realistic appraisal by the court of the circumstances of the delay. The purpose and intent of the Rule was to prevent opportunity for oppressive treatment. It must be interpreted according to its purpose and intent. I think that in Mallory the Supreme Court did just that, and no more than that.

The line between proper and improper police action is not a fixed barbed-wire barricade but is an area of circumstance. I do not shrink from the vagueness of "circumstances" and "reasonableness" as guiding standards. Many rules of law depend upon those standards. The Fourth Amendment rests upon "unreasonable". Almost all of the law of arrest depends upon the circumstances. For example, an officer can use such force as is necessary under the circumstances. Surely every police officer knows those basic rules. To tell the upper echelon of the force that the limit of permissible questioning depends upon the circumstances is not to lay down too uncertain a rule.

The foregoing is the view developed at some length by Judge Charles E. Clark in his opinion in the Leviton case.[12] Spot quotations will not do justice to that discussion. It should be read in full text, but I cannot resist the temptation of one brief extract:

"We have found no definition of 'unnecessary' in the cases helpful enough to close the matter for us here. In truth, we think that the traditional use of such words as 'undue,' 'unreasonable,' 'convenient,' 'prompt,' etc., is striking proof that each case involving the McNabb rule must needs be decided without resort to a semanticism that obscures the facts out of which it arises." [13]

*Certiorari* was denied.[14]

One more phase of the problem of confession between arrest and arraignment must be noted. The Mallory decision did

10. Supra, 318 U.S. at page 341, 63 S.Ct. at page 613.

11. Ashcraft v. State of Tennessee and Chambers v. State of Florida, supra note 8; Watts v. State of Indiana, 338 U.S. 49, 69 S.Ct. 1347, 93 L.Ed. 1801 (1949); Haley v. State of Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948); Lisenba v. People of State of California, 314 U.S. 219, 62 S.Ct. 280, 86 L.Ed. 166 (1941).

12. United States v. Leviton, 193 F.2d 848 (2d Cir., 1951).

13. Id., 193 F.2d at page 854.

14. 343 U.S. 946, 72 S.Ct. 860, 96 L.Ed. 1350 (1952).

not overrule Mitchell.[15] It did not cite or mention Mitchell. It dealt with a different problem; the facts were different. In Mitchell the Court granted *certiorari* "[i]n view of the importance to federal criminal justice of proper application of the McNabb doctrine".[16] Mitchell admitted his guilt shortly after his arrest. But he was not arraigned for eight days. "Undoubtedly his detention during this period was illegal," the Court said. "But in any event," the Court continued, "the illegality of Mitchell's detention does not retroactively change the circumstances under which he made the disclosures. These, we have seen, were not elicited through illegality. Their admission, therefore, would not be use by the Government of the fruits of wrongdoing by its officers. Being relevant, they could be excluded only as a punitive measure against unrelated wrongdoing by the police. Our duty in shaping rules of evidence relates to the propriety of admitting evidence. This power is not to be used as an indirect mode of disciplining misconduct." [17]

I now turn back to the first period of a police inquiry, *i. e.*, before probable cause for arrest appears. What is the authority of the police to question during that period?

Our attention is directed to the last sentence of the opinion in Mallory. It reads: "It is not the function of the police to arrest, as it were, at large and to use an interrogating process at police headquarters in order to determine whom they should charge before a committing magistrate on 'probable cause.' "

I refuse to agree that the Supreme Court has forbidden the police to investigate crime. But that result is quickly reached if we take the foregoing sentence and go forward on its words without ascribing to it any other sound basic idea. So far as the words are concerned, the word "arrest" might be taken to mean any detention, however brief, for what-

ever purpose, and at whatever place. So, if the police interrogate at headquarters all eyewitnesses to a crime, it could be said those persons are under arrest. And if they are under arrest the quoted sentence applies to them and the police are using an interrogating process at police headquarters in order to determine whom they should charge. Under that reading of the opinion all such witnesses would have to be arraigned. I think the Court meant no such thing.

At least one of the prime functions, if not *the* prime function, of the police is to investigate reports of crime or the actual commission of crime. The usual, most useful, most efficient, and most effective method of investigation is by questioning people. It is all very well to say the police should investigate by microscopic examination of stains and dust. Sometimes they can. But of all human facilities for ascertaining facts, asking questions is the usual one and always has been. The Courts use that method.

I ascribe to the Supreme Court what I deem to be a sensible and sound statement. The Court meant that the police cannot round up all possible suspects in a crime and then by a process of questioning at police headquarters sweat a confession out of one of them. Upshaw, supra, made clear and certain that the police cannot by long questioning obtain a confession in order to establish probable cause for an arrest. They cannot do that by taking a lone suspect and giving him this treatment in solitude, and they cannot do it by group seizure and then by group treatment squeezing, or compelling, or otherwise extracting a confession out of one. But this has nothing to do with interrogating various people to ascertain the facts about a crime.

Many strong leaders in the protection of individual rights, such as the late Judge Jerome Frank, berate inadequate police investigation. Innocent men go to

15. United States v. Mitchell, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140 (1944).

16. Id., 322 U.S. at page 66, 64 S.Ct. 896.

17. Id., 322 U.S. at pages 70–71, 64 S.Ct. at page 898.

jail or to death, they say, by reason of unthorough, hasty police inquiries. Horror stories ensue from deficient, careless investigation. It would be a simple thing for the police to charge and arraign every suspect and then wash their hands of the whole affair; it would be simple and also brutal. Judge Frank, in his book Not Guilty, did as other leaders of his type have done; he praised the persistence with which police dog a guilty man with questions until an innocent suspect is cleared.

Moreover, I think the Supreme Court did not mean that the police in the course of an investigation must scrupulously avoid asking all possible suspects any questions lest perchance one of them might readily admit guilt, or lest perchance they hit upon a fact—or an inflection—which is probable cause for a charge. The police can question suspects. In the process of investigation possible suspects must be subject to questioning.

If the police can question either a person they believe knows something about a crime or a mere suspect, how long and how can they question him? I think both the time of questioning and the mode of questioning are factors. Some negatives are plain. We have already seen that officers cannot use either a period of questioning or a method of questioning designed to or effective for extracting a confession. They cannot hold such a person without proceeding to the questioning; they cannot throw such a person into a cell block as though he were under arrest. Now, on the affirmative side, I think the rule of the cases is that the police can question a person not a suspect or one who is a mere suspect, so long as the period of detention and the mode of the questioning are reasonable under the circumstances for the purpose of obtaining information.

I think the rule of reasonable-for-the-purposes-of-information must necessarily be the rule. The police must investigate crime. That much is clear; it is one of the fundamentals of organized society as contrasted with anarchy; it is part of the rule of law. Inquiry reasonable for information purposes is no part of intensive interrogation for the purpose, or with the effect, of extracting confessions.

Whether the questioning is reasonable and proper, or whether it is so illegal as to nullify use of its fruits, is dependent upon the facts. It takes no astute student of police procedure to recognize whether the police are trying to extract a reluctant confession or whether they are reasonably seeking the solution to a crime.

In his concurring opinion in the Watts case [18] Mr. Justice Jackson discussed these problems of police investigation.

I think, if the circumstances are that the police are investigating a crime and asking available persons relevant questions, they are performing a proper function. They are not required to charge all such persons with the crime. They need not forthwith take such persons before a magistrate. It seems to me such persons are not under "arrest", within the meaning of Rule 5(a), even if they are under some sort of compulsion to go to headquarters and answer questions. The Rule cannot mean that every person questioned in connection with a crime must be arraigned.

So the sum of it is, as I see it: (1) The police can question people about a crime. (2) If and when probable cause for arresting such a person appears, he must be arrested and then arraigned without unnecessary delay. (3) If and when it develops that such a person is a material witness, there are statutory provisions as to what shall be done.[19] (4) Absent such developments ((2) and (3) above) a person may be questioned in a manner and for a period reasonable for the purpose of obtaining information. When a reasonable period for the purpose under the circumstances has expired,

---

18. Watts v. State of Indiana, 338 U.S. 49, 57, 69 S.Ct. 1347, 1357, 93 L.Ed. 1801 (1949).

19. Fed.R.Crim.P. 46(b); D.C.Code, § 4-144 (1951)

such a person must be released. (5) The police cannot question in a mode or for a period which has the effect of extracting a confession not otherwise forthcoming.

We come, then, to the third period of possible police inquiry, the period after arraignment. As I read Mallory, the Court did not overrule, impinge upon, or even by implication cast doubt upon the decision in Carignan.[20] It did not cite Carignan; the facts and the problem in Carignan were different. Carignan was detained by the police at 11 a. m., Friday, September 16, 1949, in connection with an assault. He confessed, and around 4 p. m. the same day he was arrested and arraigned for the assault. In the meantime he was questioned about a murder. He was questioned all day Saturday—the day following his arrest—on that subject, and on Monday morning the questioning began again. Sometime that day he confessed to the murder. The Supreme Court held that confession admissible against him. Carignan's detention was legal, the Court said, and it concluded: "We decline to extend the McNabb fixed rule of exclusion to statements to police or wardens concerning other crimes while prisoners are legally in detention on criminal charges." Mr. Justice Douglas, with whom Mr. Justice Black and Mr. Justice Frankfurter joined, concurred [21] but dissented on the point we are here discussing. However, as I read their opinion, it is premised upon the proposition that, when arraignment "is a pretense or used as the device for breaking the will of the prisoner on long, relentless, or repeated questionings, it is abhorrent." The dissenters said, "We should make illegal such a perversion of a 'legal' detention." So it seems to me these Justices did not mean they would outlaw all questioning after arraignment; they meant they would outlaw

confessions obtained by long, relentless or repeated questionings after arraignment.

Rule 5(a) applies to delay before arraignment and to such delay only; it has no application either in terms or in theory to events after arraignment. So in dealing with those events that Rule is out of the picture. McNabb, Upshaw and Mallory dealt with the evidentiary rule under Rule 5(a). But the constitutional rule remains in effect after arraignment as well as before it. A coerced or involuntary confession cannot be admitted, no matter when it is secured. The problem involved in the admissibility of a confession made after arraignment is a problem of coercion, not a problem of mere delay in obtaining it.

The point is made vivid by the second McNabb case.[22] After the Supreme Court remanded the McNabb case, evidence was taken concerning the arraignment. It developed that almost all questioning of the suspects, as described in the Supreme Court's opinion, had taken place *after*, not before, arraignment. The trial court thereupon admitted the confessions. The Court of Appeals for the Sixth Circuit considered the point and ruled succinctly: [23]

"Appellants complain that after their commitment they were removed from jail for the questionings, in violation of Sec. 605 of Title 18 U.S.C.A. The point is without merit. Assuming that their removal was without authority, it does not follow that it changes the circumstances under which the confessions were made. See United States v. Mitchell, supra."

The Supreme Court denied *certiorari* [24] although fully aware of the basic controversy in the case, which was the admissibility of the confessions, and of its own ruling in respect to them.

20. United States v. Carignan, 342 U.S. 36, 72 S.Ct. 97, 96 L.Ed. 48 (1951).

21. The Court affirmed, on another point, the judgment of the Court of Appeals setting aside the conviction.

22. McNabb v. United States, 142 F.2d 904 (6th Cir., 1944).

23. Id., 142 F.2d at pages 908–909.

24. 323 U.S. 771, 65 S.Ct. 114, 89 L.Ed. 616 (1944).

The problems with which we are here dealing have been the subject of two centuries of discussion and of voluminous writings. To attempt to reflect even a small fraction of the views on the subject would produce at least a small book. Citations to much of the discussion can be found in the Symposium published in the Northwestern University Law Review [25] about a year ago under the title Are the Courts Handcuffing the Police?.[26] The British have dealt with the problem intensively at least twice, and several of our states have investigated it. The Uniform Arrest Act is quite specific on some parts of these problems.[27] We are dealing with complex problems, known long since and attacked many times; we are not facing an innovation of unexplored possibilities.

The opinion of the Court in Mallory dealt with an uncomplicated situation, in which, as the Court saw the facts, there was an arrest upon ample probable cause, then hours of questioning, and an ensuing confession, all without warning or arraignment. The opinion was short. The Court simply applied to the circumstances of the case, as the Court viewed them, the rule and principle announced in McNabb and Upshaw. It cited no other cases. It announced no new rule.

## II

### The Trilling Cases

In these consolidated appeals we are reviewing three separate trials, which involved four occasions of alleged safe-cracking. Each of three trial judges, Judges Holtzoff, Keech and Matthews, submitted Trilling's confessions to a jury upon instructions to determine whether they were voluntary. Thus the problem went to three separate juries. None of the judges or jurors thought the confessions were involuntary; in each case Trilling was convicted.

My brethren make the mistake of viewing the facts in one telescoped, condensed frame—like looking back at telephone poles on a railroad track. They see arrest at 5:30 a. m., jail at 10 p. m., much questioning, ergo all confessions inadmissible. I think we should view events as they occurred.

At about 2:30 a. m., September 1, 1955, a police detective named Trammelle, who was on patrol duty, observed a car standing, with the motor off, on a dead-end street in an unlighted warehouse district. Two men were in the car. Among the warehouses on the street was that of Johnson & Wimsatt, a lumber company. In response to inquiry by the detective, one of the men got out of the car and produced his driver's permit, etc. The officer noted the data. The man was John Trilling. The officer did not detain him.

At the next midnight roll call—which would have been 12:01 a. m., September 2nd—a message was read about a housebreaking at the Johnson & Wimsatt warehouse. Detective Trammelle of course recalled the above incident. He went to the Identification Bureau. A fingerprint had been lifted from a windowpane at the Johnson & Wimsatt warehouse. The print matched a fingerprint of Trilling already on file. Trammelle went to Trilling's home and arrested him at about 5:30 a. m.

Trilling was questioned in the car en route to headquarters, and thereafter off and on until 7 a. m., when he was put in the cell block. This questioning occupied what "may have been an hour in all." Part of this hour was occupied with routine police identification, etc.[28] He was booked at 7:14 a. m. and returned to the cell block. He was not questioned further until shortly after 8 a. m. He made no admissions during this period.

25. 52 Nw.U.L.Rev. 2 et seq. (1957).

26. See also Warner, The Uniform Arrest Act, 28 Va.L.Rev. 315 (1942); 53 Yale L.J. 758 (1944); Waite, Public Policy and the Arrest of Felons, 31 Mich.L.Rev. 749 (1933); 42 Mich.L.Rev. 147, 679 (1943–44).

27. See, e. g., §§ 1, 2(3), 11.

28. R. 559, 600, 212, 213.

Detective Trammelle went off duty at 8 a. m., and a Detective Friel, also of the Safe Squad, came on duty. Trammelle told Friel that Trilling had been arrested and that they had "made" him on finger-prints on a housebreaking at the Johnson & Wimsatt Lumber Company.[29]

Friel had known Trilling's family for twenty years. He made this fact known to Trilling and told him the police had "made" him on fingerprints. Friel testi-fied five times as to the length of time he spent questioning Trilling before Trilling confessed: "a few minutes";[30] "fifteen or twenty minutes";[31] "wasn't in [sic] a matter of fifteen minutes".[32] " * * * after confronting Trilling [with certain information], * * * Trilling admitted * * *. About 8:20 a. m. or 8:30."[33] This confession related to the Johnson & Wimsatt case. Friel talked to Trilling approximately one-half hour in all. Police roll call was at 8:45 a. m.

On the police books at this time was an unsolved murder case known as the Aristo murder. It involved an attempt-ed safe robbery, and Trilling had worked nearby the Aristo plant. So Trilling was a suspect, but a mere suspect. Ser-geant Friel turned Trilling over to the Homicide Squad. Sergeant Clark of that Squad took him for tests of blood on his person. This test began at 9:40 a. m. and took approximately fifteen minutes.

At about ten o'clock Sergeant Clark called Sergeant Winter of the Safe Squad and told him, "This man has told me about some safe jobs."[34] On the Safe Squad assignment book were some fifteen unsolved cases involving safe-cracking.

Sergeant Winter, with the book before him, went down the list of these cases with Trilling. Winter testified:[35]

"Now, I took the book right from her and asked him, I said, 'All right; how about this Leon's Retail Market, at 1131 14th Street, Northwest?'

"He said, 'No'.

" 'How about Air Brakes and Con-trol at 1411 L Street, Southeast?' That is Case Number 7 on our book.

"He said, 'Yes'.

"And here is a pencil check mark that I placed beside it at that time."

In this manner Winter went through the entire list, Trilling saying as to some "I did that job" or "Yes" and as to others "Not me" or "No". He admitted eight of the listed jobs.[36]

Trilling's statements to Winter started at 10 a. m.[37] His first confession to Winter was made "immediately, or with-in seconds".[38] Winter talked to Trilling for about thirty or forty minutes, or until about 10:30 a. m.[39] Then Sergeant Clark questioned Trilling about the Aristo murder for approximately thirty or forty-five minutes.[40]

At about eleven o'clock Clark turned the defendant over to a Sergeant Deeni-han, the Homicide Squad lie detector operator,[41] who gave Trilling a test—at Trilling's request, the officers said,[42]— solely in connection with the Aristo murder.[43] The test produced "a con-clusive reading" absolving Trilling "of all implication" in the Aristo murder.[44] Deenihan told Trilling he was "exonerat-ed", and Trilling was greatly relieved.[45]

29. R. 951, 952, 218, 219, 249, 86, 969, 350, 351, 431, 596, 161.

30. R. 952, 157.

31. R. 960.

32. R. 956.

33. R. 349.

34. R. 662.

35. R. 227.

36. R. 227–232, 142, 964, 977, 965.

37. R. 755, 756, 966, 965, 142, 143, 260, 970, 977, 978, 979, 996.

38. R. 966.

39. R. 661.

40. R. 633, 632, 631, 839.

41. R. 837, 634, 641.

42. R. 99, 100, 319, 340.

43. R. 1202.

44. R. 650, 318, 1206, 1207, 1208.

45. R. 1205, 1206, 1197.

At one p. m. Trilling was returned to Sergeant Winter, and the two went to the basement of the Municipal Building, where Trilling drank a bottle of milk. They came back to the Safe Squad office, and Trilling explained more fully his part in four cases in which he had previously admitted participation. He also told Winter that, when he had been queried by Sergeant Trammelle in the middle of the night near the Johnson & Wimsatt warehouse, he and his partner were actually in the midst of their safe-cracking and had momentarily returned to their car for some tools. Between 2:15 and 2:35 Trilling dictated a written confession in the Air Brakes and Control Company case,[46] one of the cases in which he had already identified himself as a participant. As Trilling was dictating, the manager of Air Brakes and Control Company, a Mr. Spindler, arrived at the Safe Squad office [47] and witnessed the signing of the statement.[48] Spindler questioned Trilling about the details of the safe-cracking,[49] and Trilling told him, among other things, that he should get a safe with a round door, as they were harder to crack.[50]

Sometime between 2:45 and 3 p. m. Trilling was taken to the Municipal Court for the District of Columbia for arraignment proceedings.[51] A complaint was lodged against him at 3:14 p. m.[52] He thereupon appeared in court, the court, being requested to do so, appointed counsel for him, and he waived preliminary hearing. Bond was set at $5,000.

The court committed Trilling to the custody of the United States Marshal, and he left the courthouse in the actual custody of two deputy marshals, handcuffed to one of them. Authorization to return Trilling to police headquarters for further questioning was given by the United States Marshal himself.[53]

Trilling made another written confession from 4:20 to 5:30 p. m. in a case not here involved.[54]

Trilling saw his "girl friend" at headquarters for about twenty minutes before he, Winter, and the two deputy marshals went to Rock Creek Park for the purpose of recovering some tools Trilling said had been used in accomplishing various safe jobs. Trilling's co-defendant, one George Watts, with two detectives, preceded them. Being unable at first to locate the hiding place, Trilling said to Watts, "George, didn't you put them under a log?".[55] Watts pointed out the log, and under it were found a crowbar (which Trilling said was a "baby" and would open anything),[56] a hammer, four cotton gloves, and a screwdriver. Having concluded the search in Rock Creek Park, Trilling directed a search at First and Canal Streets for a watch which he had taken from the Air Brakes place. The search was unsuccessful at that time, but on the following day the watch was found in that vicinity.

Upon returning to headquarters (or possibly just before leaving for Rock Creek Park) Trilling accompanied Winter to the basement of police headquarters and there identified the safe which belonged to Mr. Stephanos Rados, proprietor of the Kennedy Food Shop, one of the places listed in the robbery assignment book. Mr. Rados himself arrived at police headquarters sometime in the late afternoon, and Trilling described to him in detail how he had cracked the safe. This confession was subsequently, between 8:20 p. m. and 8:48 p. m., reduced to writing.

In the meantime, around 7:30 p. m., Mr. Stanley S. Himmelfarb, proprietor of

46. R. 264, 669.

47. R. 272.

48. R. 307, 308.

49. R. 272, 273, 39.

50. R. 40, 260, 261.

51. R. 722, 984, 1005, 1009.

52. R. 1340.

53. R. 1215.

54. R. 1008, 1009.

55. R. 325-326.

56. R. 281.

a gas station at 3501 Connecticut Avenue, scene of another safe-cracking admitted by Trilling, arrived at police headquarters, and Trilling elaborated upon his earlier written confession. His girl friend was in the room with him from 6:30 p. m. until he was placed in jail at about 10 p. m.

At trial Trilling denied confessing to any crime on the morning of September 2nd. His testimony as to whether he confessed at all before going to court is contradictory, as was his testimony on other matters throughout the three trials. At first he recalled signing the Air Brakes confession "late that night" but subsequently remembered signing it before going to court. Actually the confession itself, as well as the testimony of Spindler and Winter, showed that it was signed at 2:35 p. m. Trilling testified in this manner throughout the trials, varying his story as he went, apparently according to what he conceived to be in his best interests. The record shows him to have been most loquacious, joking and boasting as he detailed the methods and means he employed in committing eight separate crimes, and offering gratuitous tips on the fine art of safe-cracking. He identified the safes he had cracked and the tools he used.

### III

### The Application of Mallory to Trilling

Study of the Trilling cases falls into the following parts: (1) the Johnson & Wimsatt matter; (2) the Aristo murder inquiry; (3) the oral statements about the other robberies; (4) the written confession in the Air Brakes case and the elaboration of the oral confessions; and (5) events after arraignment.

1. *The Johnson & Wimsatt matter.*

The confession to this robbery came as the result of a simple statement by an officer who had known Trilling's family. Trilling had been arrested at about five-thirty that morning, and there was ample probable cause—the fingerprint plus his having been seen by an officer near the place of the crime at about the time of the crime—for the arrest. He was legally detained under arrest from that hour. Detective Trammelle testified at all three of the trials about the length of time Trilling was questioned by him. His testimony is very clear that the actual time of questioning by him was at most an hour. The rest of the time until shortly after eight o'clock was occupied with police identification routine. This routine—checking fingerprints, etc.—was not a delay; it was an essential, unoppressive police procedure. Had the prints not checked, an important part of the grounds for belief in Trilling's guilt would have disappeared. Friel did not question Trilling for any appreciable time before the confession came. He did not question him intensively at all. There was not a shred of evidence that Trilling was held during this period in order to extract a confession. This is not a case in which the police have purposely held a prisoner, knowing that no magistrate would be available for some hours. The police waited for Trilling to come home and forthwith arrested him.

There was no prolonged or intensive questioning of Trilling about the Johnson & Wimsatt matter. There was no "process of inquiry" respecting this matter. The record shows that the police were in large measure content with their case against Trilling; they had almost caught him red-handed, and they had his fingerprint on the job. Trammelle's statement to Friel was not to urge him to question Trilling; it was a flat statement of finality—they had their man in the Johnson & Wimsatt case. No written statement about Johnson & Wimsatt was made.

My view is clear that failure to arraign before 8:15 in the morning after a 5:30 a. m. arrest is not an "unnecessary delay" in the processes of arrest and arraignment. We have to take some reasonable cognizance of the facts of life at those times of the morning. It is not unreasonable to abide normal early morning routines. The police tours of duty shift at eight o'clock. Papers have to be prepared. Judges and commissioners normally come to the office at nine or ten

o'clock. The confession did not come during an unnecessary delay.

My view is that the oral statement about Johnson & Wimsatt made to Sergeant Friel was not in violation of Rule 5(a) or the McNabb or Mallory cases and was admissible.

2. *The Aristo Murder*.

Immediately after roll call Clark of the Homicide Squad began questioning Trilling about this murder—"at that time * * * the most important case * * * in Headquarters". The killing had occurred in the midst of an attempt at a safe-cracking similar to the Johnson & Wimsatt job. Trilling had worked near the Aristo place—next door, he said. So he was a promising suspect, but a mere suspect. His hands and clothes were given a laboratory test for blood stains. He was given a polygraph (lie detector) test. The officer testified this was done at Trilling's request—Trilling says not. The examination about the murder continued, with a half-hour recess which we shall discuss in a moment, until shortly after one o'clock. As a result, Trilling was cleared of implication in the murder.

The question is whether the delay in arraignment for the Johnson & Wimsatt crime, caused by the inquiry into the Aristo murder, either (1) made the Johnson & Wimsatt confession *nunc pro tunc* inadmissible or (2) made the ten o'clock confessions to the other robberies inadmissible. The Mitchell case, supra, settles the first part of this question in the negative, and so that part requires no discussion.

An affirmative answer to the second part of the question can be reached only by holding that the detention for the Aristo inquiry was illegal. If Trilling had not been under arrest for another offense but was nevertheless a suspect in a murder, the inquiry unquestionably would have been legal and proper. It had not the remotest connection with unjust inquisitorial methods, either in time taken or in manner pursued. It was not long. No evidence of persistent or harsh

questioning appears. No evidence of untoward treatment appears. The man was cleared by the inquiry. He had a right to be asked about an offense of which he was suspected but was in fact not guilty. Clearly the manner and length of time of the questioning were reasonable under the circumstances. Surely the police can by reasonable inquiry clear a man of suspicion which lies upon him.

Does a different rule apply when the questioning occurs during a delay in arraignment for another offense? I think not. The Aristo murder and the Johnson & Wimsatt safe-cracking were separate affairs. The inquiry about Aristo caused the delay. The inquiry did not concern the offense for which Trilling was due to be arraigned. Trilling was not questioned during this delay concerning an offense for which there was probable cause for a charge. The problem is different from the problem where arraignment is delayed to permit an inquiry into the offense for which the accused has been arrested and is due to be arraigned.

I think the fact that the suspect was already legally under arrest is not in and of itself determinative of the issue of the propriety of the inquiry. To state it another way, the mere fact that the suspect is under arrest for another offense does not make the inquiry unreasonable or illegal. The fact of prior arrest is a circumstance which should be considered with all the other circumstances in determining whether the inquiry is reasonable, unoppressive, and therefore proper and legal. I think the same rule applies whether the suspect is or is not under valid arrest; that is, that the police can question a suspect already under arrest for another offense, if the questioning under that and all the other circumstances is reasonable in mode and time.

The officers involved testified specifically and repeatedly that no threats of an Aristo murder rap were used to extract any confession, either of Johnson & Wimsatt or of any other robbery. Trilling denied that he made any of the confessions before arraignment, and he also

asserted that threats were used. Thirty-nine people—three district judges and thirty-six jurors—heard Trilling testify and also heard the officers testify; not one of them believed Trilling. The Supreme Court admonished us in Mitchell [57] that in such a situation we should accept the version of the facts as believed by the jury. At any rate I do so.

I have already explained in some detail my view that the term "unnecessary delay" in Rule 5(a) has a meaning of factual substance and is not a mere prescription of a minimum of minutes.

Upon the whole of the circumstances it seems clear to me that the inquiry of Trilling about the Aristo murder was reasonable in all respects, a proper police action, even considering the circumstance that Trilling was then under valid arrest for the Johnson & Wimsatt offense. I think the delay in the arraignment for the Johnson & Wimsatt affair due to the questioning in the Aristo murder was not an "unnecessary" delay within the meaning of the Rule or the cases. I think the delay was not an illegal detention. It did not nullify the prior confession or the confessions in the other robbery cases given during its course.

### 3. Oral confessions to the other robberies.

While Clark was questioning Trilling about the murder the subject of other robberies was broached. Clark, being of the Homicide Squad, called Winter of the Safe Squad. The assignment book listed fifteen unsolved safe-cracking cases between January 1 and September 1, 1955. Many of them were of the same general nature as the Johnson & Wimsatt offense and occurred in the same general area along the railroad tracks. So Trilling was a suspect, but a mere suspect. Winter sent for the book and went down the list with Trilling and asked him one question about each case. He denied seven and was never charged with those offenses. He admitted eight and was charged with three of them. So the in-

quiry in part cleared him of suspicion and in part resulted in confessions.

The question is: Could the police ask Trilling just one question about each of these crimes? They did not subject him to a process of inquiry designed to extract a confession. Could they ask him about them as they did?

What was the duty of the police? In the interests of others who might be unjustly suspected or charged with these crimes, and in the public interest in the detection of crime, it was the duty of the police to do precisely what they did. The procedure they followed was proper and commendable police action.

I have already indicated in the discussion of the Aristo matter that I am of opinion the delay in the arraignment for the Johnson & Wimsatt affair, being due to the Aristo inquiry, was not illegal. These oral confessions came during a recess in the Aristo inquiry and were not made during a period of illegal detention.

My position here is amply supported by the opinion of the Court of Appeals for the Second Circuit in the Leviton case, supra, and by numerous writers in the field. No case that I have read holds to the contrary. I also have the support of every fighter for careful police methods, every foe of arbitrary police action which arraigns mere suspects and lets them fight their way out of the net. I repeat that I refuse to agree that the Supreme Court has forbidden the police to investigate crime by methods of inquiry reasonable in mode and time. Certainly Mallory did not do so. The oral confessions here involved were properly admitted in evidence.

### 4. The written confession on the Air Brakes safe-cracking and the elaboration of the oral confessions.

At about one o'clock Trilling was returned to Sergeant Winter, who took him downstairs in the Municipal Building to a snack bar, where Trilling had a bottle of milk and a chocolate bar. Thereafter Winter began to question him about the

---

57. Supra, 322 U.S. at page 69 note 2, 64 S.Ct. at page 898, 88 L.Ed. 1140.

crime at the Air Brakes Control place and about three other offenses. Trilling described the events in detail. As to Air Brakes, for example, he told who was with him, how they broke in, where the safe was, what sort of safe it was, what tools they used, how much money they got, how they divided it, and how they went home. Trilling then dictated a statement, and Winter typed it. It was signed at 2:35 p. m. The forepart of the statement was Trilling's agreement that he understood the statement could be used against him. While he was making these statements (the precise time is not fixed) Mr. Spindler, manager of Air Brakes, was brought in, heard the statements, asked some questions, was advised by Trilling what sort of safe is crack-proof, and signed the written statement as a witness. This written confession was a detailed confirmation of the oral confession given at 10 a. m.[58]

One view of the admissibility of this document and of these oral elaborations is that they were given during an unnecessary delay in the arraignment for the Johnson & Wimsatt offense and are therefore inadmissible. That conclusion might be based upon the view that the whole period from 8 a. m. to the writing at 2:35 p. m. was an unnecessary delay in arraignment. Or it might be based on the view that in any event the delay after one o'clock was unnecessary. The problem is not as free of difficulty as, in my view, are the other points in the case.

The statements made from 1:00 to 2:35 p. m. differ from the earlier oral confessions, in that they were given after probable cause existed for arrest and arraignment for these very offenses, and in that they were in response to more than one question. My own view, as I have explained, is that the failure to arraign before one o'clock was not due to unnecessary delay. My further view is that the delay until 2:35 was not so prolonged, or for such purpose, or so utilized, as to be prohibited as "unnecessary".

The police obviously had three things in mind. They wanted the best evidence possible of the confessions freely made, and they wanted corroboration of those earlier confessions. They also wished to locate the stolen property—money, tools, a watch, a lighter, and a pen taken from Air Brakes, and money and a safe from the Himmelfarb gas station. They were not seeking confessions—they already had the confessions—they were seeking confirmation and detail. To hold these statements inadmissible is to hold that the police, having a quick, short, blanket admission of a crime, (1) cannot reduce the admission to writing and (2) cannot inquire for details. I do not agree to that conclusion.

I think the Supreme Court did not intend to forbid the reduction to writing of an oral confession freely given. And, if it did not mean to forbid the writing, it must have meant to permit the time required for the writing.

Spontaneous and voluntary confession to nine distinct crimes is, I would think, somewhat unusual. It was only common sense to try to ascertain whether Trilling really knew the details. That he did know them was immediately evident; he discussed them to the point of garrulity. The information thus obtained served to advise the complaining witnesses of the disposition of their property.

The delay was short—not more than an hour after the lunch episode. The period was occupied in part by discussion between Trilling and a citizen whose safe had been cracked. Recognizing fully that Trilling could have been arraigned at one o'clock, I still think this sort of proceeding is not the "unnecessary delay" forbidden by the Rule. I realize that the Supreme Court has said the Rule allows the police little leeway. But it seems to me an hour's time, while an oral confession given in response to a single question was reduced to writing and signed, is so minute a period as to be within any reasonable leeway. If this had been a

---

58. At one point Trilling denied signing any statement before being taken to

court, and he persistently denied making any oral statements whatever.

prolonged period, or if the questioning had been intensive or oppressive or the treatment harsh, we would have a different problem. I get back to my basic premise, derived from the Supreme Court's opinion in Mallory, that the duty enjoined upon arresting officers does not call for mechanical or automatic obedience; the delay must not be of a nature to give opportunity for the extraction of a confession; and the circumstances of the case—not a flat time rule—are determinative of the question whether the arraignment was without unnecessary delay.

### 5. *Events after arraignment.*

Rule 5(a), McNabb and Mallory do not apply to confessions made after arraignment while an accused is in the custody of United States marshals. The Constitution, of course, applies after arraignment as well as before it. In holding inadmissible all statements made after arraignment, my brethren must be either (1) holding the confessions involuntary in the constitutional sense or (2) writing a new rule.

There is no evidence to support a conclusion that Trilling's admissions after arraignment were other than voluntary. As I have pointed out, three juries considered the problem, and there was no dissent from any one of thirty-six jurors. I say there is no basis whatever for this court to hold these admissions involuntary. I have related the facts in detail. I shall not repeat them here, but they should be re-read at this point.

It is possible for this court to make a new rule of evidence for this jurisdiction. We could rule that all admissions, voluntary or involuntary, made after arraignment are inadmissible. But I submit that such a rule, if made, should be prospective only. And I submit further that such a rule would be at variance with the whole theory of the importance of arraignment, of warning, of counsel, and of the custody of the accused in the judicial branch of government. Some new theory would have to be devised to support such a new rule. None is suggested.

In rejecting the admissions made after arraignment, my brethren do not make clear the basis of their action. They do not say whether they are applying the constitutional prohibition against coerced confessions or are writing a new rule *nunc pro tunc.*

Trilling was arraigned in open court before a judge of the Municipal Court for the District of Columbia. These judges are appointed by the President of the United States upon the recommendation of the Attorney General, with the advice and consent of the Senate. A lawyer was appointed for Trilling. He talked to the lawyer. He was committed to the custody of two deputy United States marshals. These officers are subordinates in the Department of Justice, under the supervision of the Attorney General, into whose custody federal courts usually commit convicted prisoners. When courts speak of custody of the judicial branch they mean the custody of the Attorney General. The judiciary does not operate any penitentiaries. After arraignment Trilling was at all times in the custody of the two marshals, *i. e.*, in the custody of the judiciary.

The point is disposed of by Carignan and by the second McNabb case. No further discussion of those cases is necessary. My position on the point is also supported by the whole thrust and theory of the cases from McNabb to Mallory. Those cases rest upon the function of arraignment. Arraignment took place in the cases at bar. It is not disputed that (1) Trilling was brought before a judge in open court on a complaint for house-breaking; (2) a lawyer was appointed for him; (3) he was committed to the District Jail upon failure to supply a $5,000 bail bond; and (4) he was thereupon committed to the custody of two United States marshals, who never let him out of their presence until he was jailed.

My position is that admissions made by Trilling after arraignment are admissible unless shown to have been involuntary in the constitutional sense.

## Conclusion

These cases, as now here in this court, do not present any question of involuntary confessions, on account of oppressive questioning or for any other reason. No evidence, except Trilling's, to that effect appeared in the record; the question of voluntariness was put to three separate juries by three separate district judges, and not one of these thirty-nine people believed Trilling. The cases present in one package the following questions:

1. If the police arrest upon ample probable cause at 5:30 a. m., is a delay in arraignment until 8:30 a. m. the same morning an unnecessary delay within the meaning of Rule 5(a)?

2. May the police, having a person under arrest for one offense, question him about another offense as to which he is a suspect, thereby clearing him of the latter offense, without violating Rule 5(a)?

3. May the police, having a person under arrest for one offense, ask him one question each about other offenses as to which he is a suspect, without violating Rule 5(a)?

4. May the police, having several short, oral, unexplained admissions to several offenses, delay arraignment for a short period for the purpose of inquiring into details and reducing one confession to writing, without violating Rule 5(a)?

5. May the police question an accused after he has been arraigned and is in the custody—actually and physically—of United States marshals?

To my mind it is simply unrealistic and unsupportable to say that during this day of intense activity, involving many different matters, the police delayed unnecessarily at any point. To generalize, as I think my brethren do, resting their decision upon a single telescopic statement that Trilling was questioned off and on all day from 5:30 a. m. to 10 p. m., is, to my mind, to ignore what actually took place, ignore the speed with which the police went about their work, ignore the complex of offenses involved, and lay an erroneous premise for an erroneous conclusion.

I have written at undue length in this dissent, but I firmly believe that no decision of the Supreme Court supports the judgment reached by my brethren, and that the outlawing of the conduct of the police in this case and the processes here followed by them will unjustifiably and materially impede the enforcement of the criminal law in this jurisdiction. A realistic appraisal of the circumstances is what all the cases in the Supreme Court, from McNabb to Mallory, require. There is no automatic solution to these problems.

I agree with District Judges Keech, Holtzoff and Matthews in their several but similar views of these cases. I would affirm their judgments.

---

I am impelled to comment on some differences with two of my brethren. In the first place, in crucial phases of the story I think they adopt too much of the version given by Trilling. I see no justification for us, who neither saw nor heard the witnesses, to reject the view unanimously held by so large a number of judges and jurors who both heard and saw them.

In the second place, without any evidence except Trilling's, my brethren impeach the validity of a judicial proceeding held in open court, and cast serious doubt upon the conduct of the presiding judge. With all deference I think the acceptance of Trilling's sweeping denials of all process, without one other particle of proof, is untenable. Passing reference is made to a report of a committee of the local bar association. But we do not know whether the committee held hearings, or upon what material it based its views, or how many members participated. We are advised that as a report it has no standing, not having been examined by the directors of the associa-

tion as the rules of that organization require. Moreover we are given to understand that the Municipal Court has prepared a reply but in deference to the rules has not made it public. We ought not impugn the integrity and capacity of twelve judges on so slim a showing.

Then it seems to me my brethren unjustifiably reflect upon the capacity of the lawyer appointed by the Municipal Court to represent Trilling upon arraignment. Of course Trilling, having been convicted, asserts the incompetence of his counsel, but we do not customarily accept these unsupported assertions. Present counsel informs us that efforts to locate Trilling's lawyer have been unavailing, and the Government does not challenge that statement. But those facts seem to me to reflect more upon the present participants than upon the lawyer involved. The record shows the attorney's name, with an "i" left out of the spelling. My brethren refer to this as though it were another and different name. I disagree. In the record of this case the name was spelled with a lone "e" in one of its syllables; in the court files and records it was spelled with an "ei". Either way it would have been pronounced the same way. There could not have been any real confusion. The lawyer was admitted to the bar of this court in 1930 and has since been a member in good standing. The records on file in the District Court respecting his admission to the bar show he was born in Washington, D. C., went to Central High School, took his A.B. at George Washington University and his law degree from the same University. Municipal Court records show that out of 3,500 registered attorneys in that court he was the forty-ninth to register when the registry opened in 1951. His name and telephone number appear in the telephone book. I think we ought not refer slightingly to a member of our bar for some twenty-eight years upon so slim a basis as the statement of present counsel and the Government's acquiescence, obviously made without inquiry.